[No. B143708. Second Dist., Div. Two. Aug. 14, 2001.]

ASHLEY ARNOLD, a Minor, etc., et al., Plaintiffs and Appellants, v. THE DOW CHEMICAL COMPANY et al., Defendants and Respondents.

## COUNSEL

Law Offices of Raphael Metzger, Raphael Metzger and James A. von Sauer for Plaintiffs and Appellants.

Haight, Brown & Bonesteel, Farah Nicol; Barnes & Thornburg, Andrew J. Detherage and Charles P. Edwards for Defendants and Respondents The Dow Chemical Company and Dow Agrosciences, LLC.

Prindle, Decker & Amaro, Mark Pepys; Baker & Hostetler, James L. Moore and John W. Ghezzi for Defendant and Respondent Bayer Corporation.

Seyfarth Shaw, John D. Dwyer, Todd C. Hunt and Richard E. Elder for Defendant and Respondent FMC Corporation.

Akin, Gump, Strauss, Hauer & Feld, David C. Allen, Phillip J. Eskenazi and Lisa C. Phelan for Defendant and Respondent Van Waters & Rogers, Inc.

Klinedinst, Fliehman & McKillop, Kendra J. Hall and Jennifer N. Lehman for Defendants and Respondents Lumber City Corporation and Ezell Nursery Supply, Inc.

Law Offices of Gerald Philip Peters, Gerald Philip Peters; Snyder, Dorenfeld & Tannenbaum and Bradley A. Snyder for Defendant and Respondent Q.B. Scott Company, Inc.

## OPINION

**NOTT, J.**—Appellants Ashley and Alexa Arnold, through Michelle Arnold, as guardian ad litem, appeal from a judgment entered after the trial court granted summary judgment in favor of respondents Q.B. Scott Company, Inc. (Scott), Lumber City Corporation (Lumber City), Ezell Nursery Supply, Inc. (Ezell), Dow Agrosciences, LLC, and The Dow Chemical Company (collectively referred to as Dow), Van Waters & Rogers, Inc. (Van Waters), FMC Corporation (FMC), and Bayer Corporation (Bayer); collectively referred to as respondents.

At issue is whether the preemption provisions of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136v; FIFRA) operate to foreclose appellants' state common law causes of action. We conclude that appellants' causes of action are not preempted. It is important to note that if the state common law claims are preempted, then appellants will have

absolutely no recourse for their injuries, since no private right of action exists under FIFRA. Here, the record shows that appellants used the pesticides which allegedly caused their injuries, as directed. Under those facts, we believe that the burden of the cost of serious injury actually caused by pesticides should, as a matter of public policy, be borne by the pesticide manufacturers and distributors rather than the innocent consumers. We emphasize that the issue of causation played no part in the summary judgment motions below, and may be a determinative factor in future proceedings.

We affirm in part and reverse and remand in part. We conclude that the trial court erred in granting summary judgment as to appellants' causes of action as to strict liability and breach of implied warranties of fitness and merchantability. However, to the extent that appellants alleged a cause of action in paragraphs 43 and 44 based on failure to warn, that cause of action is stricken.

## CONTENTIONS

Appellants contend that the trial court erred in granting summary judgment on the basis that their claims for strict liability and breach of implied warranty were preempted by FIFRA, because those causes of action fall outside FIFRA preemption, which is limited to labeling and packaging.

Respondents variously contend that: (1) the strict liability cause of action is expressly preempted; (2) the consumer expectations test under a theory of strict liability is inapplicable; (3) the strict liability cause of action is impliedly preempted; (4) the breach of implied warranty of merchantability cause of action is expressly preempted; and (5) the breach of implied warranty of merchantability cause of action fails due to the lack of privity between appellants and respondents.

## FACTS AND PROCEDURAL BACKGROUND

Appellants claim that Alexa suffered an intrauterine stroke, which resulted in hemiparesis (paralysis affecting one side of the body), hemianopsia (blindness affecting half of the field of vision) and disability as a result of pesticides sprayed in and scattered around her home when she was in utero. Appellants also claim that Ashley suffered pancreatitis and hepatitis as a result of exposure to the same pesticides.

## The Second Amended Complaint

On June 2, 1999, appellants filed a second amended complaint (SAC) against respondents[1] alleging causes of action for: (1) strict liability—design defect and (2) breach of implied warranties. As to the cause of action for strict liability—design defect, appellants alleged that the injuries sustained by them were caused by their exposure to the pesticides Dursban, Mr. Scott's Do-It-Yourself Pest Control, Dragnet and Baygon. Appellants alleged that on January 31, 1997, Don's Dropdead Pest Control was hired by the Arnolds' landlord to eliminate ant infestations in and around the home in which Michelle, her husband Chad, and their one and one-half-year-old daughter Ashley were residing. Michelle was pregnant with Alexa at that time. Don's Dropdead Pest Control applied a pesticide product containing Dursban and Baygon, in and around the Arnold residence. On July 9, 1997, Don's Dropdead Pest Control made another visit and applied Dursban and Dragnet to the home. Alexa was born on July 20, 1997. On December 13, 1997, Chad purchased and used a product inside the home called Mr. Scott's Do-It-Yourself Pest Control from Lumber City. Appellants alleged that "Said products were defective in their design, because they failed to perform as safely as an ordinary user would expect when used in their intended or reasonably foreseeable [manner]." The SAC alleged that the products in question contained Dursban which, in turn, contains chlorpyrifos, a pesticide with numerous known adverse toxic effects to humans. Appellants alleged that Dragnet contains the active ingredient permethrin, a pesticide with numerous adverse side effects to humans, and that Baygon, also known as Propoxur, is a pesticide with numerous adverse side effects to humans.

As to the second cause of action for breach of implied warranties, the SAC alleged that by placing the products in the stream of commerce, respondents warranted the products to be reasonably fit for their intended use and that such products were of merchantable quality. The SAC alleged that the respondents "breached said implied warranties, because said products were not fit for their intended use, were not of merchantable quality, and did not function as safely as an ordinary consumer would expect when used as directed, intended or in a reasonably foreseeable manner." The SAC alleged that respondents knew of the dangers of the chemical products but consciously disregarded appellants' safety despite knowledge of the probable dangerous consequences of exposure to said chemical products, and willfully and deliberately failed to avoid said dangerous consequences befalling appellants.

---

[1]The SAC also named the following defendants, which are not parties to this appeal: Dow Elanco & Company, Micro Flo Company, Don's Dropdead Pest Control, Don's Dropdead, and Mobay Corporation.

*Deposition Testimony of Michelle Arnold*

Michelle testified that in January 1997, Don's Dropdead Pest Control began spraying Dursban on the baseboard of the kitchen floor in her residence while she and Ashley were inside the house. After approximately 15 to 20 minutes, she and Ashley left the residence. When she returned, she noticed an oily residue along the baseboard, on the countertops, and in the cupboards. Upon inquiry, she was told by the exterminator to let the oily residue dry and then wipe it up with soap and water, which she did. During that same visit, the exterminator also scattered Dursban granules through the yard. In July 1997, Don's Dropdead Pest Control applied pesticides to the front yard while Michelle and Ashley remained in the house. Michelle could hear the exterminator on the roof of the house at one point. Later, she found pesticide granules in the yard.

*Declaration of Michelle Arnold*

Michelle declared that: "At no time when pesticides were applied in and around our home did I expect that they would cause my daughter, Ashley, to suffer pancreatitis and hepatitis, or our daughter, Alexa, to sustain an intrauterine stroke, resulting in hemiparesis, hemianopsia and great disability. Indeed, I do not believe that any parent would reasonably expect that the products designed and intended for home use would cause such injuries to children."

*The Summary Judgment Motions*

*Dow's motion for summary judgment*

Dow, the manufacturer of Dursban Pro, All-Pro Dursban 2.5 G, and the chemical chlorpyrifos alleged to have been an active ingredient in Mr. Scott's Do-It-Yourself Pest Control with Time Release Dursban[2] filed its motion for summary judgment on April 28, 2000, urging that FIFRA expressly and impliedly preempted any state law tort claim that directly or indirectly challenged the sufficiency of the labeling for a registered pesticide approved by the Environmental Protection Agency (EPA). Dow also argued that the implied warranty claims were expressly preempted and that they independently failed because appellants lacked privity of contract with Dow. The trial court denied appellants' request for leave to amend and on June 5, 2000, granted the motion for summary judgment. The trial court did not rule

[2]Dow refers to the latter product as Mr. Scott's Ready-to-Use Pest Control with Time Release Dursban.

on evidentiary objections filed by Dow to exhibits attached to appellants' counsel's declaration.[3]

*FMC's motion for summary judgment*

FMC, the manufacturer of Dragnet, filed its summary judgment motion on May 31, 2000, arguing that FIFRA expressly and impliedly preempted any state law tort claim that directly or indirectly challenged the sufficiency of the EPA-approved labeling for a registered pesticide, and that the implied warranty claim was expressly preempted. FMC also argued that the implied warranty claim independently failed because appellants lacked privity of contract with FMC. FMC further urged that summary judgment against appellants' punitive damages claims was required as a matter of law because these claims were preempted by FIFRA.

*Bayer's, Van Waters's and Scott's motions for summary judgment*

Bayer (the manufacturer of Baygon), Van Waters (the entity that sold the Dow, Bayer, and FMC pesticides to Don's Dropdead Pest Control), and Scott (the manufacturer of Mr. Scott's Do-It-Yourself Pest Control),[4] filed separate motions for summary judgment on June 2, 2000. Each summary judgment essentially urged that appellants' design defect and implied warranty claim were expressly preempted, and that the implied warranty claim independently failed because of lack of privity.

On June 30, 2000, the trial court granted the motions for summary judgment and sustained Van Waters's and Scott's evidentiary objections to the exhibits attached to the declarations of appellants' attorneys and ruled that the actions of the EPA in disapproving prospective use of one of the chemicals involved in this case was not relevant to the preemption issue.

On June 30, 2000, the trial court granted the summary judgment motions of FMC, Bayer, Scott, and Van Waters. The trial court also granted summary judgment in favor of Lumber City and Ezell, which had joined in Scott's motion for summary judgment.

### The Motion for Reconsideration

On June 5, 2000, appellants filed a motion for reconsideration of the trial court's order granting the summary judgment motion of Dow, on the basis

---

[3]When a trial court fails to rule on summary judgment evidentiary objections, the objections are waived on appeal. (Code Civ. Proc., § 437c, subds. (b) & (c); *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 783 [97 Cal.Rptr.2d 140].)

[4]Respondents refer to the product as Mr. Scott's Ready-To-Use Pest Control.

that new facts had come to light which demonstrated a change in the EPA-approved status of Dursban. This motion was based on an announcement made by the EPA on June 1, 2000, that it was banning Dursban for domestic use and school use, due to its toxic effects on children. The trial court denied the motion on July 7, 2000, for the reason that subsequent actions by the EPA were irrelevant.

DISCUSSION

## I. Standard of Review

Summary judgment is granted if all the submitted papers show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established or that an affirmative defense to that cause of action exists. (Code Civ. Proc., § 437c, subd. (n); see *Rowe v. Superior Court* (1993) 15 Cal.App.4th 1711, 1724 [19 Cal.Rptr.2d 625].) Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*). The plaintiff must set forth specific facts showing that a triable issue of material fact exists. (*Ibid.*)

In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. (*Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].) We must determine whether the facts, as shown by the parties, give rise to a triable issue of material fact. (*Walker v. Blue Cross of California* (1992) 4 Cal.App.4th 985, 990 [6 Cal.Rptr.2d 184].) In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed. (*Ibid.*)

## II. Express Preemption Under FIFRA

### A. FIFRA

Recognizing the beneficial and deleterious effects of pesticides on the environment, in 1972, Congress made substantial amendments to the original enactment of FIFRA. (*Chemical Specialties Mfrs. Ass'n v. U.S. E.P.A.* (D.D.C. 1980) 484 F.Supp. 513, 515.) Thus, FIFRA was created as a regulatory scheme requiring a careful balancing of risks and benefits before allowing the use of pesticides. (*Ibid.*) The purpose of FIFRA is to register

pesticides in order to prevent unreasonable adverse effects on the environment, including humans. (7 U.S.C. §§ 136(bb), 136a(a).) In the registration process, the EPA must find that the labeling complies with FIFRA's requirements (7 U.S.C. § 136a(c)(5)(B)), and that the pesticide, when used in accordance with its labeling "will perform its intended function without unreasonable adverse effects on the environment." (7 U.S.C. § 136a(c)(5)(C).) Under 7 United States Code section 136a(d)(1)(A), the EPA administrator (Administrator) can classify the pesticide for general or restricted use and impose labeling requirements to ensure that the pesticide is properly handled and applied.

B. *No private right of action*

■ The penalties for violation of FIFRA can only be imposed by the Administrator. Private parties, such as appellants here, have no recourse for recovery for their injuries under FIFRA.

Title 7 United States Code section 136j outlines acts that are considered unlawful under FIFRA. These unlawful acts include selling pesticides which are not registered, or are adulterated, misbranded, or whose composition differs from that described in the registration statement. Moreover, registrants are prohibited from using any registered pesticide in a manner inconsistent with its labeling or submitting false data to the Administrator. (7 U.S.C. § 136j(a)(1)(G), (R).)

Penalties imposed as a result of violation of any provision of FIFRA include the issuance of a "stop sale, use, or removal" order, or seizure. (7 U.S.C. § 136k(a), (b).) In addition, civil and criminal penalties may be imposed. Any registrant, commercial applicator, wholesaler, dealer, retailer, or other distributor who violates any provision of FIFRA may be assessed a civil penalty of not more than $5,000 for each offense. (7 U.S.C. § 136*l*(a)(1).) Any private applicator who violates FIFRA after receiving a written warning or citation may be assessed a civil penalty of not more than $1,000 for each offense, with certain exceptions. (7 U.S.C. § 136*l*(a)(2).) Any registrant, applicant for registration or producer who knowingly violates any provision of FIFRA shall be fined not more than $50,000 or imprisoned for not more than one year, or both. (7 U.S.C. § 136*l*(b)(1)(A).) Any private applicator who knowingly violates FIFRA shall be guilty of a misdemeanor and shall on conviction be fined not more than $1,000 or imprisoned for not more than 30 days or both. (7 U.S.C. § 136*l*(b)(2).)

Under 7 United States Code section 136w-2(a), a complaint may be filed with the Administrator for significant violation of pesticide use provisions of

FIFRA; the Administrator shall refer the matter to the appropriate state officials for investigation. If the state fails to act within 30 days, the Administrator may invoke various enforcement provisions within FIFRA. Other than the filing of such a complaint, however, a citizen has no recourse under FIFRA. Among other courts, the Ninth Circuit Court of Appeals has held that there is no private right of action for recovery of damages under FIFRA. In *Fiedler v. Clark* (9th Cir. 1983) 714 F.2d 77, 79, the Ninth Circuit determined that Congress considered and rejected amendments that would have authorized citizen suits for failure to perform nondiscretionary duties or for failure to investigate and prosecute violations. It held that the legislative history of FIFRA confirms that Congress did not intend to create a private right of action. (See also *Almond Hill School v. U.S. Dept. of Agriculture* (9th Cir. 1985) 768 F.2d 1030, 1039 [plaintiffs could not maintain an action pursuant to 42 U.S.C § 1983 seeking injunctive relief under FIFRA].)

Accordingly, plaintiffs who believe they have been injured as a result of exposure to pesticides must proceed under state common law theories of recovery. Therefore, should preemption be the rule and should every action be considered a failure-to-warn claim, plaintiffs will never recover for injuries they have suffered.

### C. *The argument to the trial court*

Respondents successfully argued to the trial court that the following subsections set forth in FIFRA at 7 United States Code section 136v, preempt the state tort claims alleged by appellants: "(a) **In general** [¶] A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter. [¶] (b) **Uniformity** [¶] Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

■ Article VI of the United States Constitution, the supremacy clause, says that a state law is preempted by federal law if Congress so intends. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504 [112 S.Ct. 2608, 120 L.Ed.2d 407] (*Cipollone*).) The intention of Congress can be made explicit or implicit in the federal statute. (*Id.* at pp. 516-517 [112 S.Ct. at pp. 2617-2618].) However, there is a general presumption against federal preemption. (*Id.* at p. 523 [112 S.Ct. at p. 2621].)

The law in the area of FIFRA preemption is by no means straightforward. Most federal circuit courts seem to agree that only failure-to-warn cases are

preempted by FIFRA, a decision with which the California Supreme Court is in accord. On one extreme, some federal and state courts strictly construe all state common law cases as failure-to-warn causes of action that are pre-empted by FIFRA. On the other extreme, the Montana Supreme Court has recently decided that FIFRA does not preempt failure-to-warn cases.

### D. *Etcheverry v. Tri-Ag Service, Inc. (2000) 22 Cal.4th 316*

Recently, the California Supreme Court determined that FIFRA preempts claims based on a failure to warn on EPA-approved labels, but does not preempt claims not predicated on the adequacy of the warnings on EPA-approved labels. (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 335 [93 Cal.Rptr.2d 36, 993 P.2d 366] (*Etcheverry*).) There, the trial court granted summary judgment in favor of pesticide manufacturers and a pest control adviser against claims brought by the plaintiffs who operated walnut orchards. The trial court held that the plaintiffs had stated claims that, in effect, challenged the adequacy of the labels and therefore were pre-empted by FIFRA. The trial court also held that the plaintiffs failed to produce triable issues of fact in support of their negligence, misrepresenta-tion and fraud claims. The Third District Court of Appeal reversed on the basis that state law failure-to-warn claims are not preempted by FIFRA.

In reversing the Court of Appeal, the California Supreme Court exten-sively discussed *Cipollone* in which cigarette manufacturers asserted that state law failure-to-warn actions were preempted by the Federal Cigarette Labeling and Advertising Act of 1965 (Pub.L. No. 89-92 (July 27, 1965) 79 Stat. 282, codified at 15 U.S.C. § 1331 et seq. (the 1965 Cigarette Act)) and its successor, the Public Health Cigarette Smoking Act of 1969 (Pub.L. No. 91-222 (Apr. 1, 1970) 84 Stat. 87, amending 15 U.S.C. § 1331 et seq. (the 1969 Cigarette Act)). (*Etcheverry, supra,* 22 Cal.4th at p. 323.) The *Cipol-lone* court held that the 1969 Cigarette Act, by its broad language (as opposed to the precise and narrow language of the 1965 Cigarette Act), barred not only statements, but "requirements" or "prohibitions" imposed under state law, and thus preempted common law failure-to-warn claims. (*Etcheverry, supra,* 22 Cal.4th at p. 324.)[5] The 1969 Cigarette Act, however, did not preempt claims that relied solely on the manufacturers' testing or

---

[5] "Section 5 of the 1965 Cigarette Act provided in part: '(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package. [¶] (b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.' (Pub.L. No. 89-92, § 5 (July 27, 1965) 79 Stat. 282.) [¶] By contrast, section 5 of the 1969 Cigarette Act provides: '(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarette the packages of which are labeled in conformity

research practices or other actions not related to advertising or promotion, such as express warranty, intentional fraud and misrepresentation, or conspiracy. (*Etcheverry, supra,* 22 Cal.4th at p. 335.)

The California Supreme Court in *Etcheverry* distinguished *Ferebee v. Chevron Chemical Co.* (D.C. Cir. 1984) 736 F.2d 1529 (*Ferebee*) as predating *Cipollone, supra,* 505 U.S. 504. *Ferebee* held that FIFRA does not preempt state law failure-to-warn claims because those claims are not requirements for labeling or packaging different from those required under FIFRA. (*Etcheverry, supra,* 22 Cal.4th at p. 327.) The *Etcheverry* court also distinguished *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (*Medtronic*) in which the United States Supreme Court recognized that Congress gave the federal Food and Drug Administration (FDA) a unique role in determining the scope of preemption under the Medical Device Amendments of 1976 (MDA) to the federal Food, Drug and Cosmetic Act. (21 U.S.C. § 360k(a).) The *Etcheverry* court stated that Congress did not confer a similar role on the EPA. (*Etcheverry, supra,* 22 Cal.4th at p. 329.) The *Etcheverry* court rejected the arguments of the United States, appearing as amicus curiae, that the courts have mistakenly applied the preemption doctrine in FIFRA cases because "the EPA concerns itself only with whether a pesticide would have unreasonably adverse effects on human health or the *natural* environment. In initially registering a pesticide, the EPA does not address the question whether it will control the target pest or harm the crop it was intended to protect . . . ." (*Etcheverry, supra,* 22 Cal.4th at p. 330.) Rather, the *Etcheverry* court reasoned that this is not a case based on efficacy—failure to control the target pest—but a case based on the manufacturer's failure to warn that the pesticides could damage the crop they were intended to protect (phytotoxicity). The *Etcheverry* court held that even if phytotoxicity were included within the concept of efficacy, regulation will still occur, since the EPA requires submission of efficacy data for agricultural pesticides if problems develop after initial registration, and California, while it may not impose its own requirements for labeling, can restrict or prohibit the sale or use of products that it determines are inefficacious or phytotoxic. (*Etcheverry, supra,* 22 Cal.4th at p. 332.)

The *Etcheverry* court held that "[w]hen a claim, however couched, boils down to an assertion that a pesticide's label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA." (*Etcheverry, supra,* 22 Cal.4th at p. 335.) In doing so, it cited cases where the claims were obvious or disguised labeling claims. (*Grenier v. Vermont Log Bldgs., Inc.* (1st Cir. 1996) 96 F.3d 559 [plaintiffs essentially alleged failure to warn

---

with the provisions of this Act.' (Pub.L. No. 91-222, § 5 (Apr. 1, 1970) 84 Stat. 88.)" (*Etcheverry, supra,* 22 Cal.4th at pp. 323-324.)

against use of chemically treated logs in residences]; *Taylor AG Industries v. Pure-Gro* (9th Cir. 1995) 54 F.3d 555 [plaintiffs' failure-to-warn claims were preempted to the extent they required additional or different information on the manufacturer's labels; negligent testing claim based on inadequate product labels also preempted]; *Andrus v. AgrEvo USA Co.* (5th Cir. 1999) 178 F.3d 395 [cause of action based on failure of herbicide to perform as advertised on label was preempted]; *Kuiper v. American Cyanamid Co.* (7th Cir. 1997) 131 F.3d 656 [cause of action based on statement made by herbicide dealer which reiterated statement on label was based on failure to warn and therefore preempted]; *Welchert v. American Cyanamid, Inc.* (8th Cir. 1995) 59 F.3d 69 [express warranty claim was based entirely on the herbicide label's statement and was preempted]; *Papas v. Upjohn Co.* (11th Cir. 1993) 985 F.2d 516 [claim that alleged that manufacturer failed to warn its product contains certain harmful chemicals and failed to inform users was preempted].)

The *Etcheverry* court recognized that other courts have rejected preemption challenges which did not implicate requirements for labeling different from those required by FIFRA. Some of those cases include *Burt v. Fumigation Service and Supply, Inc.* (W.D.Mich. 1996) 926 F.Supp. 624 (cause of action alleging that pesticide was defective and required a change in product design was not a claim for failure to warn through labeling and was not expressly preempted), *Reutzel v. Spartan Chemical Co.* (N.D.Iowa 1995) 903 F.Supp. 1272 (strict liability for defective design and manufacture not preempted), *Arkansas-Platte & Gulf Partnership v. Dow Chemical Co.* (D.Colo. 1995) 886 F.Supp. 762 (claims for negligence and strict liability for defective design and manufacture of pesticide not based on a theory of inadequate labeling and therefore not preempted by FIFRA), and *Higgins v. Monsanto Co.* (N.D.N.Y. 1994) 862 F.Supp. 751 (failure to fully disclose information to EPA and strict liability theory of defective design were not predicated on failure to warn or inadequate labeling and were therefore not preempted).

The *Etcheverry* court recited the allegations of the plaintiffs' complaint: that defendant Bayer negligently manufactured, formulated, produced, packaged and tested the pesticides Morestan and Guthion; and that defendants Tri-Ag and Osterlie negligently recommended the application of Morestan in combination with Guthion. The plaintiffs also alleged causes of action for strict liability for ultrahazardous activity, negligence per se for violation of the Food and Agriculture Code, product liability, breach of implied warranty, misrepresentation, and trespass. The California Supreme Court

recognized that because the Court of Appeal held that state law failure-to-warn claims are not preempted by FIFRA, it did not address the defendants' contention that all the plaintiffs' causes of action were predicated upon inadequacies in the pesticides' labels, and remanded the matter so that the Court of Appeal could do so.[6] In closing, the *Etcheverry* court considered off-label statements, that is, claims made orally or in advertising materials, outside the context of labeling or packaging. It stated that "[w]here off-label statements address matters outside the scope of the label, an action may well lie." (*Etcheverry, supra,* 22 Cal.4th at p. 337.)

Thus, the gist of the *Etcheverry* holding is that claims that are truly not failure-to-warn causes of action are not preempted. Otherwise, there would have been no need for the California Supreme Court to remand the matter back to the Court of Appeal.

The majority of federal cases have held that while failure-to-warn claims are preempted by FIFRA, state common law design defect claims are not subject to FIFRA preemption. (*Jillson v. Vermont Log Bldgs., Inc.* (D.Mass. 1994) 857 F.Supp. 985, 992 [FIFRA only preempts state labeling and packaging regulations, not claims of negligent design and manufacture which do not "permit any sale or use prohibited by FIFRA"]; *Higgins v. Monsanto Co., supra,* 862 F.Supp. at pp. 757-759 [while failure-to-warn and inadequate labeling claims are preempted by FIFRA, negligence claims based on the defendants' failure to conduct adequate testing, failure to comply with FIFRA (not predicated on a failure to warn), manufacturing and formulating, are not preempted by FIFRA; strict liability claims based on a design defect are not preempted by FIFRA]; *Burt v. Fumigation Service and Supply, Inc., supra,* 926 F.Supp. at p. 631 [failure-to-warn claims are preempted by FIFRA, but defective design claims based on the failure to include feasible warnings, as well as defective design claims that the product is defectively unsafe even without a warning, are not preempted because plaintiffs did not contend that any duty of care owed them by the manufacturer of the chemical could be satisfied with additional or different labeling material]; *Ackerman v. American Cyanamid Co.* (Iowa 1998) 586 N.W.2d 208, 215 [plaintiff's negligent design and testing claim, charging that the chemical product caused carryover damage and was not adequately degradable in

---

[6]Subsequently, the Third District issued an unpublished opinion affirming the trial court's grant of summary judgment.

certain weather conditions, was predicated on the product itself, not the labeling, and was not preempted by FIFRA].)[7]

In *Wright v. Dow Chemical U.S.A.* (M.D.Tenn. 1993) 845 F.Supp. 503, 507, the plaintiffs alleged they suffered seizures and allergic reactions to Dursban, Dursban Granular, Ficam, and Ultraban, when those pesticides were sprayed in their home. The district court determined that the plaintiffs' claims for defective design, breach of implied warranty of merchantability, and failure to properly test the products were not preempted by FIFRA. The court held that because the duty underlying the implied warranty of merchantability arises from the sale and not from state labeling regulation, and because compliance with the implied warranty of merchantability does not create a labeling requirement different from or in addition to those mandated by FIFRA, that claim survives. Moreover, claims for defective design and failure to properly test and study the pesticides, are by definition not based on labeling, and therefore are not preempted.

At the extreme end of the spectrum, the Montana Supreme Court has held that failure-to-warn claims are not preempted by FIFRA. In *Sleath v. West Mont Home Health Services* (2000) 2000 Mont. 381 [16 P.3d 1042], petition for certiorari filed May 2, 2001 (*Sleath*), the Montana Supreme Court overruled a case relied on by respondents here, *McAlpine v. Rhone-Poulenc Ag. Co.* (1997) 285 Mont. 224 [947 P.2d 474] (*McAlpine*). In *Sleath*, the plaintiffs were workers in buildings to which pesticides were routinely applied every three to six weeks, without warning to the plaintiffs, over a period of several years. The plaintiffs filed causes of action for negligence, strict products liability, and breach of express and implied warranties for personal injuries which they claim they incurred as a result of exposure to the products. The Montana Supreme Court acknowledged that it did not have the benefit of the *Medtronic* decision when it made its determination in *McAlpine*. The *Sleath* court summarized the *Medtronic* holding as "distinct features of the MDA mandated the conclusion that Congress intended only to preempt states from imposing positive law 'requirements' on medical devices in the form of regulations or laws and did not intend to preempt common law damages actions." (*Sleath, supra,* 16 P.3d at p. 1050.) That is, the 1969 Cigarette Act only preempted state requirements regarding advertising, while preemption of common law actions as a result of the MDA would extinguish all state law design defect claims regarding medical devices; the MDA provided no private damages action that would replace

---

[7]Appellants cite to *Dow Chemical Co. v. Ebling* (Ind.Ct.App. 2000) 723 N.E.2d 881, which closely parallels the facts of this case. However, that case has been taken up on appeal by the Indiana Supreme Court.

common law actions; the MDA preemption provision expressed congressional concern with the problem of specific conflicting statutes and regulations rather than general duties enforced by common law actions; and the MDA used the term "requirements," referring to statutory and regulatory law rather than common law; nor did the legislative history of the MDA suggest congressional intent to preempt all common law remedies. (*Sleath, supra,* 16 P.3d at p. 1050.) The *Sleath* court cited *Etcheverry, supra,* 22 Cal.4th 316and the amicus brief filed by the EPA therein, as well as the text of FIFRA to demonstrate that Congress had no intention of extinguishing damages remedies under state common law. Thus, a state may regulate pesticide sales or use, but may not impose labeling requirements, which the *Sleath* court interpreted as enactments of positive law. Accordingly, a state court awarding damages for failure to warn does not mandate a change in labeling, but merely requires the pesticide manufacturer pay money to the injured person. (*Sleath, supra,* 16 P.3d at p. 1051; see *Wisconsin Public Intervenor v. Mortier* (1991) 501 U.S. 597, 607 [111 S.Ct. 2476, 2483-2484, 115 L.Ed.2d 532] [7 U.S.C. § 136v plainly authorizes the states to regulate pesticides].)

On the other hand, "Many federal courts have held that when a plaintiff's negligent-design-and-testing claim does not set forth specific allegations that the product functioned improperly, or that the company was negligent in its manufacturing or testing, the claim is preempted because it is essentially predicated on the product's labeling." (*Ackerman v. American Cyanamid Co., supra,* 586 N.W.2d at p. 215, citing *Grenier v. Vermont Log Bldgs., Inc., supra,* 96 F.3d at pp. 564-565; *Taylor AG Industries v. Pure-Gro, supra,* 54 F.3d at p. 561; *Worm v. American Cyanamid Co.* (4th Cir. 1993) 5 F.3d 744, 747; and state case *McAlpine, supra,* 947 P.2d 474, overruled by *Sleath, supra,* 16 P.3d 1042, petn. for cert. filed May 2, 2001.)

### E. *Express preemption of strict liability claims*

■ Under California law, a manufacturer is strictly liable for injuries caused by a product that is (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate instructions or warnings of its potential for harm. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Three methods may be utilized in order to demonstrate a design defect: (1) the consumer expectations test shows that the product failed to perform as safely as an ordinary consumer would expect when it is used in an intended or reasonably foreseeable manner; (2) the risk-benefit test balances the risk of danger inherent in the challenged design versus the feasibility of a safer design, the cost of a safer design, the gravity of the danger, and the adverse consequences to the product of a safer design; and (3) the failure-to-warn test

imposes upon the manufacturer or retailer liability for the failure to warn of known or knowable inherent dangers in the product. (*Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1184 [74 Cal.Rptr.2d 580].)

 Our review of the SAC's strict liability cause of action shows that appellants have alleged, not a failure-to-warn, but a design defect cause of action. The SAC alleged that: "26. Said products were defective in their design, because they failed to perform as safely as an ordinary user would expect when used in their intended or reasonably foreseeable [manner]. [¶] 27. Said design defects existed in said products when the products left [respondents'] possession." The SAC also alleges that respondents manufactured the pesticides, which had numerous known adverse side effects to humans, such as respiratory problems, sweating, involuntary muscle contractions, eye pain, blurred vision, nausea, and vomiting. The SAC alleged that the central nervous system could be affected, causing fatigue, weakness, loss of reflexes, involuntary muscle contractions, and paralysis. In severe cases, the victim could suffer convulsions and coma. Chlorpyrifos, the main ingredient of Dursban, may affect the central nervous system, the cardiovascular system, and the respiratory system. The SAC alleged that the respondents were aware of the toxic effects of the active and "inert ingredients" contained in their products but consciously disregarded appellants' safety, by failing to eliminate or reduce the risk of dangerous consequences to appellants.

Respondents steadfastly assert that appellants' causes of actions are attempts to bypass FIFRA preemption through artful pleading. We disagree. Where it is not clear whether a claim is preempted, the determination of whether a claim is permissible or preempted depends on "whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or the label." (*Worm v. American Cyanamid Co., supra,* 5 F.3d at pp. 747-748; *Burt v. Fumigation Service and Supply, Inc., supra,* 926 F.Supp. at p. 629; *Jenkins v. Amchem Products, Inc.* (1994) 256 Kan. 602 [886 P.2d 869, 883]; *Hue v. Farmboy Spray Co., Inc.* (1998) 127 Wash.2d 67 [896 P.2d 682, 693].) Here, the products were designed specifically for residential use. To warn that use would cause serious and permanent injuries to children and fetuses would effectively end consumer demand for the products. Appellants' claim is that, due to the content and properties of the products, they cannot safely be used in the home. Period. Thus, the remedy sought is a change in design of the products. Appellants are not contending that, had they or their parents been aware of the warning labels, they would have declined to use the product or acted

differently. Nor do they allege that different warning labels should have been used. Indeed, other than the last pesticide administered by appellants' father, the Arnold family did not have access to any warning labels. Rather, appellants alleged that the product itself did not perform as safely as an ordinary consumer would expect when used in an intended or reasonably-foreseeable manner. That is, the gravamen of the complaint is that a consumer would reasonably believe that pesticides are designed to eliminate pests within homes occupied by humans, without causing significant harm to the humans. Thus, appellants' complaint concerns a matter "outside the label."

■ Our Supreme Court has expressly established the consumer expectations test as a theory independent from a failure-to-warn cause of action, and we conclude that appellants have alleged such a distinct cause of action. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Arena v. Owens-Corning Fiberglas Corp., supra,* 63 Cal.App.4th at p. 1184.) Under that test, "a plaintiff is required to produce evidence of the 'objective conditions of the product' as to which the jury is to employ its 'own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.' [Citation.]" (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 472 [38 Cal.Rptr.2d 739].)

■ We reject respondents' arguments that the SAC is conclusory based on our review of appellants' interrogatory responses, which describe a design defect and not a failure-to-warn claim as follows: "Defendant's products were defective in their design because they failed to perform as safely as an ordinary user would expect (as evidenced by the reactions and illnesses of responding party) when used in an intended or reasonably foreseeable manner (i.e., when used as the product was marketed to be used and in accordance with the instructions on the product) and because there existed a risk of danger inherent in the design of said products (organophosphate poisoning with dehydration, hepatitis and pancreatitis, immune system disorders, possible hearing deficit, susceptibility to carcinomas, leukemias, lymphomas, liver function problems, the danger of hemorrhagic pancreatitis with repeated exposure) which outweighed the benefits of that design (ease of use, low cost of manufacture, rating as a general use pesticide)."

Another interrogatory response states: "Baygon is a carbamate pesticide which contains as its active ingredient 2-(1-Methylethoxy) phenol methyl-carbamate, and inert ingredients. Carbamate pesticides can cause inhibition of the acetylcholinesterase enzyme, can cause cardiac arrhythmias, diarrhea,

vomiting, abdominal pain, excessive sweating and salivation, blurred vision, difficulty in breathing, headaches, muscular fasciculations. One must assume that this product was formulated as intended or the defendant would not have expended monies manufacturing or marketing said products. As chemical and pesticide manufacturers, the defendants are presumed by law to be fully familiar with the known, published toxic effects of the active ingredients contained in their pesticide products, as well as of the 'inert ingredients' contained therein, and of the toxic organic solvent contained therein."

Appellants also state: "Responding party further responds to this interrogatory by stating that there was a feasible alternative design for the Dursban products to which Ashley Arnold was exposed which would have eliminated their defects without compromising the efficacy or desirability of the products. Responding party believes that a feasible alternative to poisoning their home and children with Dursban would be to not apply the products and either dispose of them by non-toxic means (such as squishing them and wiping them up with a sponge) or by simply allowing the ants in their home to proliferate and to coexist in a non-toxic environment with responding party and her family. Lastly, Dursban was not efficacious, because the ants returned even after it was used." Further, "The Dursban products were unreasonably dangerous and defective in their design, because they woefully failed to function as safely as an ordinary user would expect, their alleged benefits were grossly outweighed by the harm they caused responding party's children, and they were not even efficacious, because the ants returned after the Dursban applications and the ants themselves were relatively harmless to responding party's children, especially when compared with the extreme dangers presented by Dursban."

The only portion of the SAC in the strict liability cause of action which we construe as a failure-to-warn claim is at paragraphs 43 and 44, where appellants alleged that respondents formulated their products with various chemicals described as inert ingredients, but which actually contained organic solvents causing irritant, neurotoxic, hematologic, hepatotoxic, nephrotoxic, and other effects on humans. In that cause of action, appellants' complaint does appear to be with the description of the inert ingredients on the label, although in their opening brief, appellants contend that paragraphs 31 through 47 relate to a claim for punitive damages with respect to the state of mind of each of the respondents regarding the marketing of their products in demonstrating conscious disregard of the rights of others. Accordingly, to the extent that paragraphs 43 and 44 state a cause of action based on labeling, those paragraphs shall be stricken.

F. *Express preemption of cause of action for breach of implied
warranty of merchantability and fitness for a particular use*

1. *The trial court erred in barring the cause of action by finding
lack of privity*

Under the California Uniform Commercial Code, every contract for the
sale of goods contains a warranty, implied by law, that the goods are of
merchantable quality. (Cal. U. Com. Code, § 2314, subd. (1).) The Califor-
nia Uniform Commercial Code also implies a warranty of fitness for a
particular purpose. (Cal. U. Com. Code, § 2315.)

As to appellants' second cause of action for breach of the implied
warranty of merchantability and fitness for particular use, the SAC alleged at
paragraph 49 that: "By placing the above-described products in the stream of
commerce, [respondents] impliedly warranted that said products are reason-
ably fit for their intended use and that such products were of merchantable
quality." Paragraph 50 states: "[Respondents], and each of them, breached
said implied warranties, because said products were not fit for their intended
use, were not of merchantable quality, and did not function as safely as an
ordinary consumer would expect when used as directed, intended or in a
reasonably foreseeable manner." The SAC alleged that respondents knew of
the dangers of the chemical products but disregarded appellants' safety
despite knowledge of the probable dangerous consequences of exposure to
the products. Moreover, respondents failed to take steps to eliminate or
reduce the risk of the dangerous consequences to appellants and fraudulently
concealed the nature and extent of the toxic hazards of the chemical prod-
ucts, especially as related to children.

Appellants' interrogatory response states: "Defendants breached implied
warranties because their products failed to perform as safely as an ordinary
user would expect when used in their intended or reasonably foreseeable
manner as evidenced by Ashley Arnold's injuries, and therefore, were not fit
for their intended uses and did not function as safely as ordinary consumers
would expect. There existed a risk of danger inherent in the design of said
products which outweighed the benefits of that design. Defendants' products
were defectively manufactured and formulated to contain chlorpyrifos, a
pesticide with numerous known adverse toxic effects to humans, especially
to children and infants. Defendants' products were defectively labeled in that
the labels infer that if one avoids breathing the spray mist, avoids contact
with the skin, eyes and clothing, washes the sprayed areas thoroughly after
use, provides adequate ventilation while spraying, prevents children from
being in this sprayed areas until surfaces are dry . . . , then the products are
safe for use."

■ Here, the trial court found lack of privity to be an insurmountable obstacle to appellants' claim for breach of the implied warranty of merchantability and fitness for a particular purpose. The general rule is that "privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale. [Citations.]" (*Burr v. Sherwin Williams Co.* (1954) 42 Cal.2d 682, 695 [268 P.2d 1041].) An exception to the general rule has been recognized in the case of foodstuffs, and has been extended to drugs, on the basis that a drug is intended for human consumption quite as much as is food. (*Gottsdanker v. Cutter Laboratories* (1960) 182 Cal.App.2d 602, 607 [6 Cal.Rptr. 320, 79 A.L.R.2d 290].) At issue in the *Gottsdanker* case was a polio vaccine, which was alleged to have caused poliomyelitis in two children shortly after they were inoculated. The court held that while in food cases there typically existed a familial relationship between the purchasers and consumers, in the case of vaccinations, it is clearly the patient and not the doctor who is the ultimate consumer of the vaccine. The court held that "[w]hile a sale is essential to impose liability under the implied warranties, the initial sale to distributor or retailer of pharmaceuticals is sufficient to impose upon the manufacturer the responsibility of fulfilling the implied warranties which run to the benefit of the persons whom the manufacturer intended to be, and who in fact became, the 'consumers.' " (*Id.* at p. 609.) That rationale applies equally to pesticides, which are solely intended to rid human habitation of pests. In any event, here, a familial relationship existed between the purchaser and the ultimate beneficiaries of one of the pesticide products. That is, Chad, the father of Ashley and Alexa, was the purchaser of Mr. Scott's Do-It-Yourself Pest Control.

Nor are we convinced by respondents' argument that *Burr v. Sherwin Williams Co., supra,* 42 Cal.2d at page 695, held that the foodstuffs exception to the privity requirement did not apply in a case involving insecticides. Rather, in *Peterson v. Lamb Rubber Co.* (1960) 54 Cal.2d 339, 344 [5 Cal.Rptr. 863, 353 P.2d 575], the California Supreme Court clarified that it had not determined in *Burr* whether there was privity between the plaintiffs and Sherwin Williams, or whether the plaintiffs came in under an exception to the rule. The *Peterson* court explained that remark as "clearly intended to guard against closing the door to the development of other exceptions as law and justice and changing economic conditions might require. . . . [T]he foodstuff exception was thus developed." (*Peterson v. Lamb Rubber Co., supra,* 54 Cal.2d at p. 344.) Furthermore, *Evraets v. Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779, 788 [34 Cal.Rptr.2d 852], cited by respondents, is not similar to this case. There, the court found there was no privity between the plaintiff and the manufacturer of an intraocular lens, which had

been implanted in the plaintiff's eye, because the surgeon who performed the surgery selected the product. Thus, the plaintiff did not rely upon the seller's skill or judgment to select or furnish a suitable product. Here, as stated, Chad was the direct purchaser of Mr. Scott's Do-It-Yourself Pest Control.

Another approach which extends the privity doctrine to include a person other than the direct buyer occurs when an inherently dangerous instrumentality causes harm to a buyer's employee, the employee is considered to be in privity with his employer. Thus, in *Peterson v. Lamb Rubber Co., supra,* 54 Cal.2d at page 347, the court held that privity, which denotes mutual or successive relationship to the same thing or right of property, should not bar an action where an employee had the successive right to the use of a grinding wheel purchased by his employer. In the same fashion, appellants were the ultimate users of the pesticide sprays applied by the pest control operators.

We conclude that the doctrine of privity does not bar appellants' cause of action for breach of implied warranty.

### 2. *Implied warranty claims are not preempted*

We note that, unsurprisingly, federal and state cases go both ways in determining whether claims alleging breach of implied warranties of merchantability, fitness for particular purpose, or safety are preempted by FIFRA. Because we agree that the implied warranty of merchantability and fitness for particular purpose does not create a labeling requirement different from or in addition to those mandated by FIFRA, and therefore, by definition should not be preempted, we follow the cases that hold there is no preemption. (*Wright v. Dow Chemical U.S.A., supra,* 845 F.Supp. at pp. 510-511; *Malone v. American Cyanamid Co.* (1995) 271 Ill.App.3d 843 [208 Ill.Dec 437, 649 N.E.2d 493, 499] [Congress did not intend FIFRA to preempt state common law actions for breach of implied warranty based on advertising]; *Jeffers v. Wal-Mart Stores, Inc.* (S.D.W.Va. 2000) 84 F.Supp.2d 775 [warranty claims based on packaging not preempted by FIFRA].) We reject those cases cited by respondents which hold that FIFRA preempts warranty-based claims such as *Hue v. Farmboy Spray Co., Inc., supra,* 896 P.2d 682 [implied warranty claim that pesticides should not be used in area prone to drift is problem cured by warning on label]. *Taylor AG Industries v. Pure-Gro, supra,* 54 F.3d at page 563 likewise does not assist respondents. There, in support of its implied warranty claim, the plaintiffs only presented evidence that the distributor should have supplied information in addition to or different from the manufacturer's labels. Therefore, the Ninth Circuit determined such a claim was preempted.

We conclude that the trial court erred in granting summary judgment on the breach of implied warranty cause of action as to all respondents.

### III. Respondents' arguments

#### A. Express preemption of strict liability cause of action by FIFRA

Respondents urge that FIFRA requires that the EPA undertake a comprehensive review and evaluation process in deciding whether to register a pesticide and that by registering any pesticide, the EPA necessarily has concluded that the product poses no unreasonable risk of harm when properly applied and that its packaging, testing, and accompanying labeling are reasonable and appropriate when the project is "used in accordance with widespread and commonly recognized practice." (7 U.S.C. § 136a(c)(5)(D).) Moreover, respondents outline the labeling and regulations required under FIFRA, including content, placement, type size, and prominence of warnings as well as precautionary statements and directions for use. Respondents claim that the EPA-accepted labels permitted residential or domestic application of the products.

Respondents exhaustively cite from the Code of Federal Regulations to support their argument that comprehensive data is provided to the EPA during the registration process. We do not argue with that fact. However, we do not find persuasive respondents' argument that appellants have merely characterized their claim as one for design defect, in order to avoid preemption. In making their argument, respondents ignore the essence of the *Etcheverry* decision that claims not based on labeling are not preempted.

While respondents cite to cases in which the strict liability claims at issue were preempted because they were actually disguised warning claims, nothing in respondents' argument convinces us that appellants' claims are similar. In *Worm v. American Cyanamid Co., supra,* 5 F.3d at page 744, the strict liability claims were based on the defendant's "false" representations, made on labels and literature distributed with the herbicide at issue, that corn could be grown 11 months after applying the herbicide. There, however, the plaintiffs' claims regarding the adequacy of information provided by the defendant was preempted because they "never maintained, beyond the conclusory allegations of the complaint, that the product itself functioned improperly or that the company was negligent in its manufacture or testing." (*Id.* at p. 748.) Unlike here, the plaintiffs did not allege that the product itself functioned improperly or that the company was negligent in its manufacture or testing. Respondents' reliance on *National Bank of Commerce v. Dow Chemical Co.* (8th Cir. 1999) 165 F.3d 602, 608 is similarly misplaced.

While it is true that the Eighth Circuit Court of Appeals held that FIFRA preempted certain negligence and product liability claims which were disguised failure-to-warn claims, it also held that the plaintiffs' claim of defective manufacture or design as a result of inadequate manufacturing or inappropriate design was not preempted by FIFRA. The preempted claims alleged negligence in failing to place warning labels on containers, failing to implement an ongoing education program, suppressing information from the public and failing to adequately warn. As previously mentioned, only paragraphs 43 and 44 of the SAC allege any claim for failure to warn.

In sum, respondents' arguments here are misleading. For example, respondents cite *Higgins v. Monsanto Co., supra,* 862 F.Supp. at page 759, for the proposition that strict liability claims will be preempted if they are predicated on failure to warn and inadequate labeling, but disregard the fact that the *Higgins* court went on to hold that in that case, since the plaintiff's claims of strict liability rested on a theory of defective design and not on a theory of inadequate warnings, the claims were not preempted by FIFRA. (*Id.* at pp. 759, 760.)

B. *The consumer expectations test*

Respondents assert that appellants' consumer expectations cause of action is based on three claims of design defect: (1) defective labeling; (2) the products contain toxic inert ingredients; and (3) the products are unsafe for domestic or residential use.[8]

Dow urges that the attack on its products must fail because one interrogatory response exposes appellants' claim as one for failure to warn. The interrogatory response stated that: "Defendants' products were defectively labeled in that the labels infer that if one avoids breathing the spray mist, avoids contact with the skin, eyes and clothing, washes the sprayed areas thoroughly after use, provides adequate ventilation while spraying, prevents children from being in the sprayed areas until surfaces are dry . . . , then the products are safe for use." As we previously noted, paragraphs 43 and 44 are the only sections which can be construed as failure-to-warn causes of action (which will be stricken), and we agree with Dow that such a construction is preempted by FIFRA.

Bayer specifically complains that the SAC targets its product Baygon, as "a pesticide with numerous known adverse toxic effects to humans," which

---

[8]Dow correctly asserts that in their opposition to Dow's motion for summary judgment, appellants abandoned any design defect cause of action based on an allegation that the risk of harm of the products outweighed their benefits. While appellants' attorney initially addressed a cause of action based on a risk/benefit analysis during oral argument, he did not respond to Dow's assertion that he had abandoned such a cause of action. Accordingly, we treat that cause of action as abandoned.

contains both active and inert ingredients that are highly toxic to humans. In a conclusory manner, Bayer contends that these allegations boil down to an attack on the label because the EPA requires that an ingredients statement appear on the products label, citing 40 Code of Federal Regulations part 156.10(a)(vi) (2000). Bayer argues that an allegation that Baygon is toxic is, in effect, an allegation that Bayer had the duty to warn of toxicity. Bayer's argument is circular—that any complaint about any product boils down to an attack upon the label, therefore any attack on any product is preempted. As previously discussed, this is not what *Etcheverry, supra,* 22 Cal.4th 316 holds.

FMC specifically contends that one of appellants' interrogatory responses directly challenges the adequacy of information contained on the product labels. The response states: "Defendant, as a manufacturer and formulator of insecticides and pesticides, is presumed to have knowledge of the research into the harmful effects of its products and its products' ingredients, contaminants and adjuvants. That the products are labeled without full disclosure of known and/or potential harmful effects of its products and its products' ingredients, including 'inert ingredients,' and contaminants evidences defendant's willful disregard of the health and safety of individuals, including plaintiff herein, and of its fraudulent concealment of known dangers. That the defendant markets its products and places them into the stream of commerce as formulated and manufactured indicates that a decision to do same was made by employees of the defendants."

To the extent that the interrogatory response cited by FMC supports paragraphs 43 and 44 of the SAC, it is preempted as a labeling claim. However, to the extent that appellants urge that paragraphs 31 through 47 refer to a claim for punitive damages with respect to the state of mind of the respondents regarding the marketing of their products, that interrogatory response does not state a preempted labeling claim.

Respondents also urge that the allegation that the pesticides are toxic is an attack on labels, citing *Torres-Rios v. LPS Laboratories, Inc.* (1st Cir. 1998) 152 F.3d 11, 16. Respondents urge that since the EPA, under FIFRA, has determined that the pesticide will perform under the label conditions without unreasonable adverse effects on people in the environment, any allegation that the inert and active ingredients and Scott's products are toxic is an allegation that Scott failed to warn. In their complaint, at paragraph 43, appellants allege that respondents "intentionally manufactured and formulated the foregoing products with various chemicals described as 'inert ingredients,' but which contained organic solvents which are highly toxic to humans, especially to children and fetuses." As we have previously held, to

the extent that appellants are alleging a failure-to-warn claim in this paragraph, it is stricken.

Respondents further contend that appellants' argument that the products contain a design defect because they are unsafe for residential or domestic use is a disguised attack on the label, again referring to the extensive labeling requirements set forth in FIFRA. Respondents' reasoning is that because the EPA has accepted labels which specifically provide for residential use, the claim is preempted by FIFRA, citing *Hue v. Farmboy Spray Co., Inc., supra,* 896 P.2d 682 and *Grenier v. Vermont Log Bldgs., Inc., supra,* 96 F.3d at pages 564-565. Those cases do not assist respondents. In the *Hue* case, the court found that the plaintiffs' claims were based on failure to warn, since the gist of their claim was that the pesticide should not be used in an area where there is a risk of long-distance drift or mass air contamination. That is, the only way for the manufacturer to correct that type of problem would be to label the product properly. On the other hand, the court also recognized that the plaintiffs' design defect claims were *not* preempted by FIFRA. (*Hue v. Farmboy Spray Co., Inc., supra,* at p. 693.) In *Grenier v. Vermont Log Bldgs., Inc., supra,* 96 F.3d at pages 564-565, the court held that a claim that chemically treated wooden logs used to build a residential log house were defectively designed because it was foreseeable that they would be used in residences was actually a failure to warn against residential use. The court went on to state that: "This certainly does not mean that every misdesign or mismanufacturing claim would be debarred by section 136v. In a batch of properly made products, one item might be defective or tainted; or perhaps one might design a pesticide that, while properly approved and labeled, was unduly dangerous for any legitimate use. In the former case, it is hard to see why FIFRA preemption would even be arguable; in the latter, there would be at most an *implied* preemption claim, based not on section 136v but on EPA's approval of the product; and it is by no means clear that such a preemption claim would prevail." (*Id.* at p. 565, fn. omitted.)

Moreover, respondents further urge that appellants' consumer expectations-based design defect claim cannot succeed because when a manufacturer's warnings meet the federal requirements for a product label, a strict liability claim cannot be based upon the consumer expectations test, citing *Papike v. Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737 (*Papike*). In *Papike*, the plaintiff claimed that the manufacturer failed to adequately warn the public of the dangers of tampon use and that the tampon was defectively designed because it contained a layer of viscose rayon, which she alleged amplified toxin production. As to the failure-to-warn cause of action, the court determined that the FDA promulgated regulations which were device and disease specific, and that the matter was preempted. With respect to the

consumer expectations cause of action, the court cited *Barker v. Lull Engineering Co., supra,* 20 Cal.3d 413 for the proposition that under California law, a product is defectively designed if it fails to meet an ordinary consumer's expectations, or if injury is attributable to a specific design feature of the product and risks associated with the design outweigh its benefits. The court held that because Tambrands' warnings met the federal requirements, the plaintiff's design defect claim must fail. Respondents cite the following language: "To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate." (*Papike,* at p. 743.)

We find that *Papike* is distinguishable because there, the Ninth Circuit did not consider the issue of preemption in determining that the plaintiff's design defect claim failed to meet the elements of the consumer expectations test. Had it considered the preemption issue in connection with the consumer expectations test, the analysis would certainly have been very different from the analysis performed in this case because the federal statutory scheme in those cases are distinct. For instance, the MDA gives the FDA broad powers under the MDA to classify and regulate medical devices with special controls, such as specific labeling information. (*Papike, supra,* 107 F.3d at p. 738.) Title 21 Code of Federal Regulations part 808.1(d) (2001) states that state and local requirements are preempted only when the FDA has established specific counterpart regulations. Moreover, 21 Code of Federal Regulations part 808.1(d)(1) (2001) provides that state or local requirements of general applicability are not preempted where the purpose of the requirement relates to other products in addition to devices, or to unfair trade practices in which the requirements are not limited to devices.

Van Waters also urges that allowing a consumer to have greater expectations of safety than the EPA mandates would defeat the purpose for which FIFRA was enacted, that is, to create a uniform system of pesticide regulation. However, we do not believe that the expectations expressed by appellants are based upon the label, which they never saw. Here, consumer expectation is a question of fact for the jury. (*Soule v. General Motors Corporation, supra,* 8 Cal.4th at p. 563.)

Scott contends that we can disregard appellants' allegations that the products were defective because they were toxic, since in their opening brief they admitted that their allegations "are not material for design defect strict liability." Scott does not, however, quote appellants in context. Appellants argue in their brief that only paragraphs 31 through 47 "are not material for design defect strict liability," because they relate to a claim for punitive damages with respect to the state of mind of each of the respondents

regarding the marketing of their products in demonstrating conscious disregard of the rights of others. Thus, the remaining paragraphs, 1 through 29, do relate to design defect strict liability.

Nor do the other cases cited by respondents convince us otherwise. *Haddix v. Playtex Family Products Corp.* (7th Cir. 1998) 138 F.3d 681 and *Reece v. Good Samaritan Hospital* (1998) 90 Wash.App. 574 [953 P.2d 117] merely apply the holding in *Papike, supra,* 107 F.3d 737, which we have found distinguishable. *Lescs v. William R. Hughes, Inc.* (4th Cir., Jan. 14, 1999, No. 97-2278) 1999 WL 12913 and *Ruiz-Guzman v. Amvac Chemical Corp.* (9th Cir., Nov. 28, 2000, No. 98-35088) 2000 WL 1763212, are unpublished, uncitable decisions. Here, on the other hand, we are given guidance both by *Cippolone* and *Etcheverry* that nonlabeling causes of action are not preempted by FIFRA.

For the first time on appeal, respondents argue that the consumer expectations claim fails for a third, independent reason. Citing *Soule v. General Motors Corp., supra,* 8 Cal.4th at pages 566-567, respondents urge that when the product at issue and the plaintiff's claims are complex, the consumer expectation test is inapplicable. That case, however, involved a theory of design defect of an automobile, which demanded an understanding of technical and mechanical detail and how safely an automobile's design should perform under the esoteric circumstances of the collision at issue. This case is more like *Sparks v. Owens-Illinois, Inc., supra,* 32 Cal.App.4th at pages 474-475, in which the First District determined that the product at issue, asbestos-containing block insulation, was within the ordinary experience and understanding of a consumer. Similarly, in *Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559, 1568 [38 Cal.Rptr.2d 446], we found that the alleged technical novelty of the airbag does not preclude resort to the consumer expectations test. We stated that "The consumer expectations test is not foreclosed simply because expert testimony may be necessary to explain the nature of the alleged defect or the mechanism of the product's failure." (*Ibid.*)

C. *Implied conflict preemption*

The trial court did not reach the issue of implied conflict preemption raised in the summary judgment motions, but we shall consider this issue on appeal. (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1244 [100 Cal.Rptr.2d 403].)

Implied conflict preemption occurs where "a federal statute implicitly overrides state law either when the scope of a statute indicates that

Congress intended federal law to occupy a field exclusively, [citation], or when state law is in actual conflict with federal law." (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 287 [115 S.Ct. 1483, 1487, 131 L.Ed.2d 385].) However, the existence of an express preemption clause supports an inference that implied preemption is foreclosed. (*Id.* at p. 289 [115 S.Ct. at p. 1488].) In *Freightliner Corp.*, the United States Supreme Court found that because the plaintiffs' common law design defect actions did not conflict with the National Traffic and Motor Vehicle Safety Act of 1966 (Pub.L. 89-563 (Sept. 9, 1966) 80 Stat. 718, codified as amended at 15 U.S.C. § 1381 et seq. (Safety Act)), the defendants' implied preemption argument was futile. (*Freightliner Corp. v. Myrick, supra,* 514 U.S. at p. 289 [115 S.Ct. at p. 1488].)

■ Respondents argue that appellants' claims are impliedly preempted because their claims challenged the reasonableness of the products' presence in the marketplace, and specifically conflict with an EPA permissive regulation.

We disagree. The court, in *Burt v. Fumigation Services and Supply, Inc., supra,* 926 F.Supp. at page 632, stated that FIFRA provisions " 'reflect the general goal of the 1972 amendments to strengthen existing labelling requirements and ensure that these requirements were followed in practice.' " The court concluded that there was no implied preemption because "[r]egistration of a pesticide does not preclude as pre-empted a claim that the product is defectively unsafe as manufactured or formulated." (*Ibid.*) We agree with the reasoning of the *Burt* court.

Moreover, to the extent that appellants' claims challenged the labeling of the products, we have held that they are preempted. But, in accord with *Etcheverry, supra,* 22 Cal.4th at page 336, appellants' claims that the products were defectively designed are not labeling claims and therefore do not interfere with the powers granted by Congress to the EPA to regulate labeling of the pesticide products. Nor are we convinced by Scott's citation to *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861 [120 S.Ct. 1913, 146 L.Ed.2d 914] for the proposition that appellants' causes of action frustrate the purposes of FIFRA. In *Geier*, the United States Supreme Court held that the plaintiffs' "no airbag" lawsuit conflicted with a 1984 version of a Federal Motor Vehicle Safety Standard promulgated by the Department of Transportation under the authority of the Safety Act. (*Geier v. American Honda Motor Co., supra,* 529 U.S. at p. 864 [115 S.Ct. at p. 1916].) The court found that the preemption provision of the Safety Act included a saving provision that excludes common law actions. However, nothing in the language of the saving clause suggested an intent to save state law tort

actions that conflicted with federal regulations. (*Id.* at p. 869 [115 S.Ct. at p. 1919].) Examining the history of the Safety Act, the court found that the act envisioned a gradually developing mix of passive restraint devices, which objective would be impeded by the allowance of a state tort law claim. (*Id.* at p. 886 [115 S.Ct. at p. 1928].)

We do not find that any objective of FIFRA, a labeling statute, would be frustrated by appellants' pursuit of their state law tort claims.

D. *The motion for reconsideration*

Dow argues on appeal that the trial court properly denied appellants' motion for reconsideration. Because appellants have not briefed that issue on appeal, the issue is abandoned, and we shall not address that argument.

## CONCLUSION

We conclude that the trial court erred in granting summary judgment as to appellants' causes of action as to strict liability and breach of implied warranties of fitness and merchantability. However, to the extent that appellants alleged a cause of action in paragraphs 43 and 44 based on failure to warn, that cause of action is stricken.

## DISPOSITION

The trial court's judgment is affirmed in that paragraphs 43 and 44, insofar as those paragraphs state a claim based on failure to warn, are stricken. In all other respects, the judgment is reversed and remanded. Appellants shall recover their costs on appeal.

Boren, P. J., and Todd, J., concurred.

Petitions for a rehearing were denied September 13, 2001, and respondents' petition for review by the Supreme Court was denied November 14, 2001. Chin, J., did not participate therein.