Filed 5/8/25  Gardea v. Lakeshore Equipment Co. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ENRIQUETA GARDEA,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>LAKESHORE EQUIPMENT COMPANY et al.,<br><br>        Defendants and Respondents. | B331222<br><br>Los Angeles County<br>Super. Ct. No. 21STCV37047 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Serena R. Murillo, Judge.  Affirmed.

Shegerian & Associates, Carney R. Shegerian, Anthony Nguyen, Mark Lim and Iman Alamdari for Plaintiff and Appellant.

Jackson Lewis, John M. Remy, Adam Y. Siegel, Amanda G. Papac and Dylan B. Carp for Defendants and Respondents.

———————————

Appellant Enriqueta Gardea brought claims against her former employer and supervisors—Lakeshore Equipment Company, Lakeshore Learning Materials, Pamela Kissinger, and Star Williams (together, Defendants)[1]—primarily for discrimination, harassment, and retaliation based on race and disability. Defendants moved for summary judgment and produced strong evidence that they terminated Gardea because of her poor work performance. The trial court granted Defendants' motion, and Gardea appealed.

On appeal, Gardea contends the trial court erred because she submitted sufficient evidence to survive summary judgment. However, she fails to support her arguments with citations to that evidence. Her arguments also lack merit. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Background*

Lakeshore is a company that develops and sells educational materials and products for children. Lakeshore hired Gardea as an at-will employee in 1993. Gardea identifies as a "Hispanic/Latina" woman.

#### a. *Gardea joins Special Services*

Gardea worked in Lakeshore's warehouse in various positions until March 2019, when Lakeshore transferred her into its Special Services department. Gardea did not want to leave the warehouse, but she agreed to the transfer after she was told it was mandatory.

---

[1] According to Defendants, Lakeshore Learning Materials was a DBA name of Lakeshore Equipment Company, which later changed its corporate name to Lakeshore Learning Materials, LLC. For the sake of simplicity, we simply refer to "Lakeshore."

Gardea worked as an administrative assistant in Special Services. Her job duties included "conversions," "pricing confirmations," and "cassette testing." Conversions required Gardea to " 'convert' " a competitor's list of products or a customer's generic list of desired products into comparable Lakeshore products and item numbers.

Kissinger was Gardea's direct supervisor in Special Services. Kissinger reported to Paul Escoto, who reported to Eric Solheim.

b. *The vacation phone call*

Kissinger was on vacation the week of May 27, 2019. During that time, two Special Services employees called Kissinger to complain about Gardea. Kissinger then called Gardea to discuss her coworkers' concerns. We refer to this incident as the "vacation phone call."

The next day, Gardea asked Lakeshore's Vice President of Supply Chain, Mario Savastano, for advice on how to handle the situation with Kissinger. Savastano advised Gardea to talk to Lakeshore's Director of Human Resources, Star Williams.

Gardea took Savastano's advice and told Williams that Kissinger had belittled her during the vacation phone call and made her feel as though she was not wanted in Special Services. Williams arranged for an in-person meeting with Kissinger and Gardea, which took place shortly after Kissinger returned from vacation.

c. *Lakeshore places Gardea on a Performance Improvement Plan*

Between May and September 2019, Kissinger and other Special Services employees repeatedly caught and addressed mistakes in Gardea's work. The employees would discuss the

3

mistakes with Gardea, explaining what she had done wrong. Gardea did not dispute making mistakes, but she insisted they were immaterial. According to Gardea, Kissinger told her conversions are subjective and it could take up to a year for her to become sufficiently familiar with Lakeshore's products.

In September 2019, either Kissinger or Williams proposed placing Gardea on a "performance improvement plan" (PIP). Escoto agreed with the proposal.

On September 25, 2019, Kissinger provided the written PIP to Gardea. The PIP states its purpose "is to identify key areas where performance is not meeting expectations so that you may improve your performance to an acceptable level." The PIP lists six areas of improvement, including "[c]heck your math before submitting" your work, "[u]se your resources when doing conversions," "[p]roof your work," "[i]mprove your speed and productivity in all you are assigned," and "[a]lways notify the assignee when the assignment is completed." The PIP also states, "Your current performance level is not sustainable. We want you to be successful and in order to do so, we need to see immediate and consistent improvement in the areas mentioned above. We will continue to meet weekly and will do a more thorough assessment in 30 days. Do not be afraid to ask questions!"

On October 2, 2019, Kissinger placed a note in Gardea's employee file stating she continued "to make similar mistakes on conversions." The note listed seven specific mistakes Gardea had made recently. It also asserted Gardea made "math mistakes" every day and would offer wrong items or quantities "due to not reading the [job] request thoroughly." According to the note,

4

Kissinger would go over each conversion with Gardea line-by-line and explain the necessary changes.

That same day, Gardea asked Escoto to transfer her out of Special Services. Escoto told Gardea he would not transfer her because she was currently on a PIP.

On October 8, 2019, a Special Services employee discovered that Gardea had accidentally deleted one of the department's templates several weeks earlier. Rather than tell anyone about the mistake, Gardea secretly began using an outdated template. Kissinger described the situation as "a mess" and said "we are dealing with a lot of do-over work to re-enter the invoices on the correct template."

Kissinger documented two mistakes Gardea made on October 16, 2019. First, Gardea selected non-washable paints in response to a customer's request for washable paints. Second, in response to a customer's request for a tool set for a young child, Gardea offered a product for older children that contained a "small part[s] warning."

d.      *Gardea suffers a wrist injury*

On October 11, 2019, Gardea started experiencing pain and numbness in her wrist. She reported the issue to Kissinger, and a Lakeshore employee drove her to a clinic. The clinic diagnosed Gardea as having a wrist sprain and provided her a brace to wear. Gardea returned to work that afternoon wearing the brace. A few days later, Kissinger sent Gardea an email that said, "I hope your wrist is feeling better."

Gardea had a follow-up appointment at the clinic on October 17, 2019. The clinic released Gardea from its care and instructed her that she could continue to wear a brace on her wrist if it was helpful. Gardea never asked Lakeshore for any

kind of accommodation or change in her job due to her wrist injury.

      e.     *Lakeshore terminates Gardea*

At some point in October 2019, Kissinger proposed to Williams that Lakeshore terminate Gardea. Williams agreed with Kissinger, and they brought the issue to Escoto, who had the authority to terminate Gardea. Escoto and his manager, Solheim, agreed that termination was appropriate. Lakeshore ultimately terminated Gardea's employment on October 24, 2019.

## 2. *Gardea's complaint*

Two years later, on October 7, 2021, Gardea filed a complaint against Lakeshore, Kissinger, and Williams. The complaint generally alleged that Defendants had taken adverse employment actions against Gardea because she is Hispanic and disabled, and because she reported discrimination.

The complaint asserted claims under the Fair Employment and Housing Act (FEHA) for discrimination, hostile work environment, retaliation, failure to provide reasonable accommodation, failure to engage in the interactive process, and failure to prevent discrimination, harassment, and retaliation. The complaint also alleged claims for negligent hiring, supervision, and retention, wrongful termination in violation of public policy, whistleblower retaliation, and intentional infliction of emotional distress (IIED).[2]

## 3. *Defendants' motion for summary judgment*

Defendants filed a motion for summary judgment. Defendants asserted they terminated Gardea for a

---

[2]     Gardea alleged other claims, but she dismissed them in response to Defendants' motion for summary judgment.

nondiscriminatory reason, and Gardea cannot produce sufficient evidence to show their reason was false or pretextual. Defendants supported their motion primarily with excerpts of depositions from Kissinger, Williams, Escoto, and Gardea, which established most of the facts summarized above.

Kissinger also testified that Gardea's mistakes created more work for her and her assistant manager, who had to review every conversion Gardea produced. Kissinger met with Gardea nearly every day to review the mistakes she was making. Kissinger would print out a copy of Gardea's work, highlight everything that had to be corrected, and review those corrections with Gardea. It was a time-consuming process, but Kissinger thought it might help Gardea to learn what she was doing wrong.

Kissinger said she decided to place Gardea on a PIP because she was not improving. Gardea continued to make basic and obvious mistakes while on the PIP. Kissinger met with Gardea one-on-one at least three times each week during the PIP period. At those meetings, Kissinger told Gardea she was not meeting expectations and was still "missing the mark."

Kissinger said she was frustrated by Gardea's lack of progress while on the PIP, and she felt as though Gardea had not made an effort to improve. Kissinger discussed Gardea's performance issues with Star Williams. They decided to terminate Gardea based only on her poor performance.

Kissinger testified that she was aware that Gardea went to a medical clinic for a wrist injury in October 2019. After returning from the clinic, Gardea said her wrist was still sore but "she could return to full work." Kissinger told Gardea she could go home and rest until she "felt better and well enough to work." Gardea declined the offer and continued to work.

Kissinger testified that Lakeshore terminated another employee in Special Services—Jaleah Ferguson—the same day it terminated Gardea. Ferguson and Gardea had the same job title and position. Kissinger decided to terminate Ferguson because she was making similar mistakes as Gardea. Kissinger had not placed Ferguson on a PIP because she was relatively new to the company and did not seem interested in learning. Ferguson is not Hispanic.

Kissinger said she supervised six employees in Special Services, including Gardea, during the relevant time period. Kissinger knew one of those employees identifies as Hispanic, and she believed two other employees might also be Hispanic. Kissinger did not consider Gardea to be Hispanic, although she remarked that everyone in Southern California is "part Hispanic."

Star Williams testified that Lakeshore's management transferred Gardea from the warehouse to Special Services to address concerns with her work. Management was hopeful that Gardea could develop while working under Kissinger, who had a reputation for being a good teacher and trainer.

According to Williams, she had a meeting with Kissinger, Escoto, and Solheim about a week before Gardea's PIP was scheduled to end. At that meeting, they jointly and unanimously decided to terminate Gardea based entirely on her failure to meet the terms of the PIP.

Williams asserted that Lakeshore hired or transferred three employees to replace Gardea and Ferguson in Special Services. One of the new employees identifies as Hispanic.

Escoto testified that Gardea did not demonstrate a "strong sense of urgency and a can-do attitude." She made lots

8

of mistakes and did not ask for help when she needed it. Some of Gardea's mistakes could have caused Lakeshore to lose sales.

Escoto said Kissinger recommended terminating Gardea because she continued to make mistakes while on the PIP. Escoto and his supervisor, Solheim, approved the termination. The only reason for the termination was the "mistakes that [Gardea's] making on her performance." Escoto denied that Gardea ever expressed concerns to him about discrimination, harassment, or retaliation.

### 4.    *Gardea's opposition*

In opposition to Defendants' motion, Gardea submitted a declaration and excerpts from her deposition. According to Gardea, during a one-on-one meeting in April 2019, Kissinger asked if Gardea knew Mexicans "get free tuition, free food, free this, free that; they don't have to work, and they're illegals." Kissinger also said Mexicans are "lazy and get everything free." Gardea responded that she "always worked [her] whole life." This was the only time Kissinger said anything negative about Hispanics in front of Gardea.

Gardea said she believed Kissinger made the derogatory comments because Gardea is Mexican. However, Gardea admitted she did not know if Kissinger knew she is Mexican.

Gardea testified that she reported Kissinger's comments to Escoto in May 2019. Gardea was crying, and Escoto offered her a tissue. Escoto said only that Kissinger has "been here for a long time."

Gardea testified at her deposition that, during the vacation phone call, Kissinger accused her of not being a team player and said she is not a "thoroughbred." In her declaration, Gardea asserted that Kissinger also called her "lazy."

9

Gardea said she reported the vacation phone call to Star Williams. Gardea told Williams that Kissinger had belittled her and made her feel as though she were not wanted in Special Services. Williams said it was not fair for Gardea to feel that way, but she did not offer to investigate Kissinger.

According to Gardea, Kissinger never met with her to discuss her progress during the PIP period.

Gardea testified that she asked Escoto to transfer her out of Special Services. She told Escoto it was not fair that she was placed on the PIP and she had been retaliated against. Escoto told Gardea she could not transfer.

Gardea said she started feeling pain and numbness in her hand in October 2019. She notified Kissinger of the issue and went to a clinic. Her issues worsened over time, and she was diagnosed with tendinitis in her wrist in June 2020. The condition "makes typing difficult at times" and causes joint pain.

Gardea presented evidence that Escoto and Williams met to discuss the logistics of Gardea's termination a few days before the actual termination. Escoto said it was possible the decision to terminate Gardea had been made a week earlier.

Gardea submitted testimony from Williams that no one at Lakeshore conducted a thorough assessment of Gardea's performance at the conclusion of the PIP. Williams also acknowledged that the PIP did not mention possible termination and that Lakeshore does not have a written policy preventing an employee from transferring departments while on a PIP.

Gardea also submitted her performance evaluations for 2016 through 2018, which showed she " 'exceed[ed] expectations.' "

**5.**    *The court's order*

The trial court granted Defendants' motion for summary judgment.  With respect to Gardea's FEHA claims, the court concluded Defendants submitted sufficient evidence showing they were motivated solely by Gardea's "well documented" "work mistakes and performance issues."  The court then shifted the burden to Gardea to present sufficient evidence showing Defendants engaged in intentional discrimination or their stated reason was pretextual.  The court concluded Gardea failed to meet her burden.  The court also determined Gardea failed to raise triable issues of fact on her other claims.

The court entered judgment for Defendants, and Gardea timely appealed.

## DISCUSSION

**1.**    *Standard of review*

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  The burden then shifts to the plaintiff "to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action."  (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1180; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.)  A triable issue of material fact exists if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar*, at p. 850.)  The court is authorized to grant summary adjudication only if the motion "completely

11

disposes of a cause of action." (Code Civ. Proc., § 437c, subd. (f)(1).)

We review an order granting summary judgment de novo and independently decide whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) We consider "all the evidence set forth in the moving and opposition papers" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*)), and all evidence the parties submitted in connection with the motion, except that which the court properly excluded (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476).

"In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) "A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment." (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158.)

**2.      *Gardea has not met her burden on appeal***

Defendants contend Gardea forfeited her arguments on appeal because her opening brief fails to cite evidence in the record. Gardea instead cites the points and authorities she submitted in opposition to Defendants' motion for summary judgment.

Gardea does not dispute that she failed to support her brief with citations to evidence in the record. However, she

12

characterizes her failure to do so as a "minor procedural issue." Gardea urges us either to disregard the issue or to provide her an opportunity to "correct any perceived deficiencies" in her brief.

Contrary to Gardea's characterization, the deficiencies in her brief are neither perceived, minor, nor procedural. The most fundamental rule of appellate review is that the judgment challenged on appeal is presumed to be correct, and "it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) To meet that burden, an appellant must present "citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Here, Gardea's arguments on appeal require her to show affirmatively that she submitted evidence raising triable issues of fact sufficient to survive a motion for summary judgment. However, Gardea has not directly pointed us to such evidence in the record. Instead, she cites a brief drafted by her attorneys. It is "elementary" that an attorney's statements—including statements in briefs—are not evidence. (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 843; see *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590 (*Alki*) ["Matters set forth in points and authorities are not evidence."].)

Making matters worse, Gardea's trial court brief also does not directly cite evidence in the record. Instead, it cites the separate statement that Gardea submitted in support of her opposition. That document does cite actual evidence. However, it does not use the pagination of the Appellant's Appendix. Thus, it is a time-consuming process to cross reference the citations in Gardea's trial court brief with the actual evidence in the record on appeal. Gardea has essentially outsourced that work to this

13

court, but we are under no obligation to complete it for her. (See *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 14 [a reviewing court is not required to search the record to see if it supports the appellant's contentions].)

Because Gardea fails to cite actual evidence in the record supporting her arguments on appeal, she has not met her burden to show error. This alone provides a sufficient reason to affirm the judgment. (See *Alki, supra*, 4 Cal.App.5th at p. 590 ["By failing to support the factual assertions in their legal arguments with citations to the evidence, plaintiffs have forfeited their argument the court erred in granting summary judgment."].) Nevertheless, we will also consider her arguments on the merits.

3.    ***Discrimination claims***

a.    *Applicable law*

The FEHA prohibits employers from discharging, or otherwise taking adverse employment actions against, an employee "because of" certain protected characteristics, including race, national origin, and physical disability. (Gov. Code, § 12940, subd. (a).) " '[B]ecause of' means there must be a causal link between the employer's consideration of [the] protected characteristic and the [adverse] action taken by the employer." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 (*Harris*).) In a case involving mixed motives, that means the plaintiff must prove "discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor" in the adverse employment action. (*Id.* at pp. 215, 232.)

An employee can prove a FEHA violation by direct or circumstantial evidence. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 549.) Where, as here, a plaintiff relies

14

on circumstantial evidence, California courts apply the burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) to analyze federal employment discrimination claims. (See *Guz, supra*, 24 Cal.4th at p. 354 [burden-shifting test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially"].)

Under the *McDonnell Douglas* test, the employee has the initial burden at trial to establish a prima facie case of discrimination, which creates a presumption of discrimination. (*Guz, supra*, 24 Cal.4th at pp. 354–355.) The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. (*Id*. at pp. 355–356.) If the employer meets its burden, the presumption disappears and the burden shifts back to the plaintiff to attack the employer's reason as a pretext for discrimination or to offer other evidence of a discriminatory motive. (*Id*. at p. 356.)

That framework is modified in the context of an employer's motion for summary judgment. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861 (*Serri*).) As the moving party, the employer " 'has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Ibid*.) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus,

15

'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*." (*Guz, supra,* 24 Cal.4th at p. 358.)

If the employer meets this burden, "the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Serri, supra,* 226 Cal.App.4th at p. 861.) The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be to create a reasonable inference of a discriminatory motive. (*Guz, supra,* 24 Cal.4th at p. 362 & fn. 25.)

"In responding to an employer's showing of a legitimate reason for the complained-of action, a plaintiff cannot show merely that the employer's decision was wrong, mistaken, or unwise. [Citation.] Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for a nondiscriminatory reason." (*Hawkins v. City of Los Angeles* (2019) 40 Cal.App.5th 384, 395 (*Hawkins*).)

      b.    *Defendants presented strong evidence of a nondiscriminatory reason for terminating Gardea*

Gardea does not meaningfully dispute that Defendants submitted sufficient evidence showing they terminated her for a nondiscriminatory reason. Nor could she. Defendants

16

presented testimony from Kissinger, Williams, and Escoto that they placed Gardea on the PIP because of her poor performance while working in Special Services, and they terminated her solely because she continued to make mistakes while on the PIP.

As the trial court observed, Gardea's mistakes while working in Special Services were "well documented." Defendants submitted ample evidence showing Kissinger and Gardea's coworkers repeatedly caught and addressed errors in her work. According to Escoto, the types of mistakes Gardea was making could have caused Lakeshore to lose sales. Moreover, Kissinger testified that Gardea's mistakes created more work for her and her assistant manager, who had to review every conversion Gardea produced.

Defendants produced evidence showing they made efforts to help Gardea improve. Kissinger, for example, testified that she met with Gardea nearly every day to review her mistakes and explain how to correct them. Despite those efforts, Gardea's performance did not improve, which prompted Defendants to place her on the PIP.

Defendants also presented evidence that Gardea continued to make basic and obvious mistakes while on the PIP. On October 2, 2019—a week after Defendants placed Gardea on the PIP—Kissinger documented seven specific errors Gardea had made, noting Gardea continued to make "math mistakes" every day. On October 8, 2019, Gardea's coworker discovered Gardea had been using an outdated template because she had deleted the correct template several weeks earlier. On October 16, 2019, Kissinger documented two more mistakes Gardea made, one of which involved selecting a product that could have caused a choking hazard for young children.

17

This evidence was more than sufficient to meet Defendants' burden to show a legitimate nondiscriminatory reason for terminating Gardea.  Accordingly, the trial court properly shifted the burden to Gardea to show Defendants' reason was a pretext to mask an illegal motive, or that Defendants acted with discriminatory animus.  (*Serri, supra*, 226 Cal.App.4th at p. 861.)  Moreover, because Defendants' evidence of a nondiscriminatory reason was strong, Gardea was required to do more than show a minimal prima facie case of discrimination in order to survive summary judgment.  (See *Guz, supra*, 24 Cal.4th at p. 362 & fn. 25.)

c.    *Race*

Gardea contends she met her burden by presenting evidence from which a reasonable trier of fact could infer that Kissinger terminated her because of her race.[3]  Gardea does not meaningfully argue that the other employees who approved her termination—Williams, Escoto, and Solheim—personally acted with discriminatory intent.  Nevertheless, she contends Kissinger's intent can be imputed to them.

Gardea points to no direct evidence of Kissinger's discriminatory intent.  Instead, she relies primarily on evidence showing Kissinger made offensive remarks about Mexicans.  Specifically, Gardea points to her deposition testimony that, during a one-on-one meeting in April 2019, Kissinger asked Gardea if she knew Mexicans "get free tuition, free food, free this,

---

[3]    At various times, Gardea has referred to the discrimination as being based on her race, nationality, ethnicity, ancestry, and national origin.  In her appellate briefs, Gardea primarily refers to discrimination based on race.  For the sake of simplicity, we do the same.

free that; they don't have to work, and they're illegals." According to Gardea, Kissinger also said Mexicans are "lazy and get everything free."

Although such comments are certainly offensive, they are not directly connected to Gardea or to her termination. At most, they reveal a general animus towards Hispanics.[4] However, evidence that Kissinger possessed a general animus towards Hispanics is not sufficient to establish a FEHA discrimination claim. Instead, there must be some basis to infer Kissinger's animus motivated her to terminate Gardea. (See *Harris*, *supra*, 56 Cal.4th at p. 232 [the FEHA does not impose liability "based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision"].)

Gardea did not produce sufficient evidence from which a reasonable trier of fact could make that connection. At the outset, Gardea points to no evidence in the record showing Kissinger knew or believed she is Hispanic. To the contrary, Kissinger testified that she did not consider Gardea to be Hispanic, and Gardea admitted she did not know whether Kissinger knew she is Mexican. Absent evidence that Kissinger knew or believed Gardea is Hispanic, Gardea cannot establish that Kissinger's animus towards Hispanics was a factor in her termination, let alone a substantial motivating factor.

Even assuming Kissinger knew Gardea is Hispanic, any inference of discrimination is weak compared to Defendants'

---

[4] In her appellate briefs, Gardea seems to use the terms "Mexican," "Latina," "Latinx," and "Hispanic" interchangeably. Because Gardea's complaint alleged discrimination because she is Hispanic, we use only that term.

19

strong evidence of a nondiscriminatory reason for terminating her.  Gardea testified that Kissinger made the offensive comments in April 2019, six months before Gardea's termination.  Gardea points to no incidents in which Kissinger's alleged animus towards Hispanics manifested itself during those six months.  The isolated nature of Kissinger's comments, combined with the relatively long temporal gap between them and the adverse employment action, significantly weakens any inference of discrimination.[5]

---

[5] Gardea suggests in passing that Kissinger's animus is evident from the fact that she called Gardea "lazy" during the vacation phone call, which mirrored the language Kissinger purportedly used to describe Mexicans.  The only evidence of Kissinger's comment comes from Gardea's own declaration submitted in support of her opposition to the motion for summary judgment, which contradicts her earlier deposition testimony.  "Where a declaration submitted in opposition to a motion for summary judgment clearly contradicts the declarant's earlier deposition testimony or discovery responses, the trial court may fairly disregard the declaration."  (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087.)  In any event, Kissinger's remarks during the vacation phone call support only a weak inference of animus given the lack of evidence that Kissinger knew Gardea is Mexican.  Kissinger's comments during the call are not sufficient to show a discriminatory intent, even when considered with evidence of Kissinger's other comments about Mexicans.

Gardea also suggests in passing that Kissinger "dehumanized" her during the vacation phone call by likening her to a work horse.  Gardea does not directly argue that Kissinger's comments reflect racial animus.  Accordingly, they are irrelevant for purposes of her FEHA claims based on race discrimination.

20

Other undisputed evidence in the record further weakens any link between Kissinger's comments and Gardea's termination.  During the time Gardea worked in Special Services, Kissinger supervised five other employees.  Defendants presented undisputed evidence that Kissinger believed one to three of those employees were Hispanic.  There is no evidence even suggesting that Kissinger treated those employees any differently than she treated the non-Hispanic employees under her supervision.  Indeed, Defendants presented evidence that all the Hispanic employees in Special Services—other than Gardea—received promotions.  Defendants also presented undisputed evidence that they replaced Gardea with an employee who is Hispanic.  Defendants' evidence of favorable treatment of other Hispanic employees undermines any inference of race-based treatment, and Gardea failed to address or counter that evidence in any way.

Gardea also fails to address the undisputed evidence that Kissinger terminated a non-Hispanic employee—Ferguson— on the same day as Gardea and for the same stated reason.  If anything, the record suggests Defendants treated Gardea better than Ferguson, despite Kissinger's supposed animus towards Hispanics.  According to Kissinger, Defendants terminated Ferguson without first placing her on a PIP.  In contrast, they placed Gardea on a PIP, purportedly to give her an opportunity to improve and avoid termination.

Gardea contends discrimination can be inferred from evidence that Defendants' stated reason for terminating her was pretextual.  According to Gardea, Kissinger's testimony on the subject is "rife with blatant contradictions."  Specifically, she contends Kissinger testified both that Defendants relied solely on her performance during the PIP period, and also that

21

Defendants considered her mistakes before the PIP went into effect.

Given Gardea's failure to cite Kissinger's actual deposition testimony, it is difficult to evaluate her argument. Nevertheless, to the extent there is a contradiction in Kissinger's testimony, its probative value is minimal. The record reflects that Kissinger and the other defendants have consistently maintained they terminated Gardea because of her poor performance while working in Special Services. Whether they relied solely on Gardea's performance during the PIP period—or whether they also considered her performance leading up to the PIP— is insufficient to show pretext.

Nor do we agree with Gardea's assertion that pretext can be inferred from Defendants' failure to warn her sufficiently of her performance deficiencies. Gardea does not dispute that Kissinger and other Lakeshore employees repeatedly informed her of her mistakes. Nor does Gardea dispute being aware that she was placed on the PIP because of those mistakes. Although Kissinger never explicitly warned Gardea that she faced termination, it was implicit in the text of the PIP, which informed Gardea her "current performance level is not sustainable."

Gardea contends it is "laughable" for Defendants to assert they terminated her because of her poor performance during the PIP period. According to Gardea, she made only two minor "computer . . . mistakes during the entirety of the period."

Contrary to Gardea's contention, the undisputed evidence shows she made numerous and significant mistakes during the PIP period. Indeed, Kissinger documented at least nine mistakes Gardea made during that time, one of which involved a safety risk to young children. Gardea's contention is further

undermined by the undisputed evidence that Defendants terminated another employee—Ferguson—for the same reason. Absent evidence that Ferguson's termination was pretextual, Gardea cannot seriously contend her mistakes were insufficient to warrant termination.

Gardea suggests the mistakes she made were excusable because conversions require " 'subjective' " decisions, which can take a year to learn. However, the undisputed evidence shows Gardea's mistakes did not arise from a lack of experience or involve errors in judgment. Rather, Defendants presented undisputed evidence that Gardea made basic and obvious mistakes, even after being placed on the PIP. For example, on October 2, 2019—more than six months after Gardea joined Special Services—Kissinger reported that Gardea was making "math mistakes" every day and would offer wrong items or quantities "due to not reading the [job] request thoroughly."

Gardea contends pretext can be inferred from evidence showing she was a highly-rated employee for many years while working in the warehouse. However, Defendants' evidence shows Gardea was terminated for performance issues that arose only after she was transferred out of the warehouse. Gardea does not dispute making frequent mistakes while working in Special Services. Nor did she present evidence showing she had similar performance issues while working in the warehouse. Accordingly, her positive performance reviews during that time have little probative value on the issue of pretext.

Gardea asserts pretext also can be inferred from evidence showing Kissinger failed to comply with the PIP's requirement of weekly progress meetings. The PIP, however, required no such thing. Instead, it stated only that Kissinger and Gardea

23

would "*continue* to meet weekly." (Italics added.) Although Gardea insists they never met specifically to discuss her progress under the PIP, Kissinger testified that she and Gardea continued to have their regular one-on-one meetings throughout the PIP period.

Nor is there merit to Gardea's suggestion that Defendants violated the PIP by failing to conduct a meeting at the end of the PIP period. The PIP states "[w]e . . . will do a more thorough assessment in 30 days." However, it does not specify that the assessment would take the form of a meeting with Gardea. Nor did Gardea produce evidence that such a meeting was a common practice for Lakeshore.

Gardea also contends Defendants violated the PIP by terminating her before the 30-day period came to an end. However, if the first and last days of the PIP are included —September 25 and October 24—it lasted exactly 30 days. Regardless, the PIP did not guarantee Gardea employment for its entire length.

Nor can pretext be inferred from evidence suggesting Defendants made the decision to terminate Gardea as early as a week before the PIP was scheduled to end. By that time, Gardea had already made the errors that Defendants cited as the reason for terminating her. Indeed, the last mistake Defendants documented occurred on October 16, 2019, eight days before the termination.

Gardea contends pretext can be inferred from evidence showing Escoto failed to investigate her complaint about Kissinger's comments about Mexicans. However, Gardea does not assert that Escoto personally acted with a discriminatory intent or harbored any animus towards her because she is

24

Hispanic. Instead, she argues Kissinger's intent can be imputed to him. Escoto's lack of investigation, therefore, does not raise triable issues of fact as to pretext.

To summarize, Defendants presented strong evidence to support their assertion that they terminated Gardea because of her poor work performance. In contrast, Gardea's evidence of pretext and discriminatory intent was weak. Kissinger's alleged comments about Mexicans suggest animus towards Hispanics. However, they were an isolated incident that occurred six months before Defendants terminated Gardea. Any inference of discrimination is further weakened by Defendants' undisputed evidence that Kissinger did not discriminate against other Hispanic employees under her supervision, Kissinger terminated a non-Hispanic employee for the same reason as Gardea, three other Lakeshore employees—who had no apparent animus towards Hispanics—approved Gardea's termination, and Lakeshore hired a Hispanic employee to replace Gardea.

Viewing the record in the light most favorable to Gardea, no reasonable trier of fact could conclude Defendants' stated reason for terminating her was pretextual or that discrimination was a substantial motivating factor. Gardea did not meet her burden, and the court properly granted Defendants' motion on her claims for race discrimination under the FEHA.

d. *Disability*

Gardea contends she met her burden by presenting evidence from which a trier of fact could conclude Defendants discriminated against her because of her disability. In support, Gardea points to evidence that she was terminated less than two weeks after suffering a wrist injury at work.

25

Assuming, for the sake of argument, that Gardea's wrist injury constituted a disability for purposes of the FEHA, she nevertheless failed to meet her burden to show discrimination because of it.  Gardea points to no evidence whatsoever showing Defendants harbored animus towards her because of her disability, or towards disabled employees more generally.  She suggests no other reason why Defendants would want to terminate her because of her disability, nor is any such reason apparent.  Indeed, it is undisputed that Gardea did not request any accommodations, and there is no evidence that her disability significantly affected her work performance.

In passing, Gardea suggests discrimination can be inferred solely from the fact that Defendants failed to offer her reasonable accommodations or engage in the interactive process.  As we discuss later in this opinion, Gardea failed to submit sufficient evidence that Defendants were required to do either.  Therefore, Defendants' inaction does not provide evidence of discrimination.

Gardea contends the "suspicious" timing of her termination —13 days after she suffered the wrist injury—is sufficient to raise an inference of discrimination.  However, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination."  (See *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353 (*Arteaga*).)  As we discussed above, Defendants submitted strong evidence showing they had a legitimate nondiscriminatory reason for terminating Gardea, and Gardea failed to show that reason was pretextual.

On this record, and viewing the evidence in the light most favorable to Gardea, no reasonable trier of fact could conclude Defendants discriminated against Gardea because of her

26

disability. Accordingly, the court properly granted Defendants' motion with respect to Gardea's FEHA claims for disability discrimination.

**4.** ***Retaliation claims***

The FEHA makes it unlawful for any employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).) To establish a claim for retaliation, the plaintiff must show she engaged in a " 'protected activity,' " the employer subjected the employee to an adverse employment action, and a causal link exists between the protected activity and the employer's action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) "FEHA retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 942.)

Gardea contends she engaged in a protected activity by reporting Kissinger's alleged "discriminatory and harassing racial remarks" to Escoto, Savastano, and Williams. She asserts Defendants retaliated against her by placing her on the PIP and subsequently terminating her. According to Gardea, Defendants' failure to investigate the complaints and the "suspect timing" of the adverse employment actions raise a sufficient inference of retaliation. We disagree.

Although there is evidence that Gardea complained about Kissinger to Savastano and Williams, there is no evidence that the complaints concerned Kissinger's alleged remarks about Mexicans. Instead, the undisputed evidence shows Gardea complained only about the vacation phone call. There is no

27

evidence Gardea told Savastano or Williams that Kissinger's behavior was racially motivated or that Kissinger had otherwise discriminated against her based on her race. Therefore, even if Defendants took adverse actions against Gardea because she complained to Savastano and Williams, it would not constitute actionable retaliation under the FEHA. (See *Yanowitz, supra*, 36 Cal.4th at p. 1042 [a FEHA retaliation claim requires "a causal link . . . between the protected activity and the employer's action"].)

There is evidence that Gardea reported Kissinger's alleged remarks about Mexicans to Escoto. However, no reasonable trier of fact could conclude that report caused Defendants to take adverse employment actions against Gardea. As best we can tell, Gardea does not contend that Escoto personally retaliated against her based on her complaint. Instead, she seems to argue that only Kissinger did so. However, there is no evidence that Kissinger was aware of Gardea's complaint to Escoto. In fact, Gardea insists Escoto took "no action" whatsoever in response to her complaint, which would include discussing the complaint with Kissinger. Absent some evidence that Kissinger was aware of the complaint, Gardea cannot show a causal link to the adverse employment actions. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 [" 'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' "].)

Even if Kissinger's knowledge of Gardea's complaint could be inferred, no reasonable trier of fact could conclude Defendants retaliated against Gardea because of it. As we discussed above, Defendants presented undisputed evidence that Gardea made repeated mistakes while working in Special Services, which they

28

have consistently cited as the reason for taking adverse actions against Gardea.  Gardea failed to present sufficient evidence that Defendants' reasons were false or pretextual in the context of her discrimination claims, which is equally true in the context of her retaliation claims.  Nor has Gardea addressed Defendants' evidence that Ferguson was terminated despite not having engaged in protected activity.  On this record, no reasonable trier of fact could conclude Defendants' stated reasons for taking adverse actions against Gardea were false or pretextual.  Accordingly, the trial court properly granted Defendants' motion as to Gardea's retaliation claims.

Gardea's reliance on *Hawkins, supra*, 40 Cal.App.5th 384, is misplaced.  In that case, a different panel of this court affirmed a jury verdict for the plaintiffs on their FEHA retaliation claims. (See *id*. at pp. 387–388, 392.)  The plaintiffs made protected complaints in August 2012 and May 2013, which prompted an investigation that ended in October 2013.  The City fired the plaintiffs in November and December 2013.  This court held the "closeness in time from the complaints and investigation to the City's firing of plaintiffs establishes the requisite causal link" for purposes of establishing a prima facie case of retaliation. (*Id*. at p. 394.)

Gardea suggests that, because the temporal gap between her complaint and the adverse employment actions is smaller than the gap in *Hawkins*, it is sufficient to raise an inference of discrimination.  She is mistaken.  The court's discussion of temporal proximity in *Hawkins* concerned the first step in the *McDonnell Douglas* framework, which requires the employee to show a prima facie case of retaliation.   At that step, "[t]emporal proximity between the protected activity and the adverse action

is sufficient to shift the burden to the employer to articulate a [lawful] reason for the adverse employment action." (*Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, 56.)

Here, Defendants presented evidence of legitimate and lawful reasons for their actions, which shifted the burden back to Gardea to show those reasons were untrue or pretextual. "[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a [lawful] reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112; see *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388; *Arteaga, supra*, 163 Cal.App.4th at p. 357.) Accordingly, *Hawkins* is inapposite.

**5.** *Harassment*

Gardea contends the trial court erred in granting Defendants' motion with respect to her FEHA harassment claim. According to Gardea, she raised a triable issue of fact by presenting evidence of Kissinger's "offensive and discriminatory comments . . . about Mexicans," which constituted harassment and created a hostile working environment.

The FEHA makes it unlawful for an employer to harass an employee based on membership in a protected class, including race. (Gov. Code, § 12940, subd. (j)(1).) "To prevail on a claim that a workplace is racially hostile under FEHA, an employee must show she was subjected to harassing conduct that was (1) unwelcome; (2) because of race; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create

30

an abusive work environment." (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627 (*Bailey*).)  A hostile work environment " 'must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284; see also *Bailey,* at p. 629 ["The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position."].)

"Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.]  'The working environment must be evaluated in light of the totality of the circumstances.' [Citation.]  ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citation.]  ' "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." ' [Citation.]  ' "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" ' are not sufficient to create an actionable claim of harassment." (*Bailey, supra*, 16 Cal.5th at p. 628.)

Here, Gardea's harassment claim is premised on evidence that Kissinger made offensive comments about Mexicans.[6]

---

[6] Gardea suggests in passing that her harassment claim also is based on remarks Kissinger made during the vacation phone call.  According to Gardea, Kissinger's comments during that call were "dehumaniz[ing]" and showed Kissinger "clearly viewed Gardea in the same light as other members of the Mexican and

Because the comments were an isolated incident, Gardea must show they were "extremely serious" in order to survive summary judgment.  Gardea has not met that burden.

In *Bailey*, the California Supreme Court held an African-American plaintiff raised triable issues of fact on a harassment claim by presenting evidence that a coworker called her an unambiguous racial epithet, which the court referred to only as the "n-word." (*Bailey, supra*, 16 Cal.5th at pp. 619–620.) There was evidence the utterance of the epithet altered the conditions of the plaintiff's work environment.  Her psychiatrist provided a letter indicating the plaintiff was being treated for severe anxiety and depression as a result of workplace stress.  She had gone to a managerial employee's office crying on a "few occasions," and was still "visibly upset" 10 months later.  (*Id.* at p. 635.)  There was no comparable evidence in this case to raise a triable issue of fact as to whether the comments interfered with Gardea's work performance.  While Gardea asserts she was in tears when she reported the comments to Escoto, she proffered no evidence that the comments were directed at her, that they caused her ongoing emotional distress, or that her reaction to the comments was in any way responsible for her documented poor work performance.  Viewing the evidence in the light most favorable to Gardea, no reasonable trier of fact could conclude

---

Hispanic communities—lazy, freeloading illegals."  However, Gardea admitted she did not know if Kissinger was aware she is Mexican, and Kissinger did not directly connect the comments to Gardea's race.  Even if the comments support an inference of discriminatory animus, they were not sufficiently serious or pervasive to support a FEHA claim for harassment.

Kissinger's comments created a hostile work environment or otherwise constituted harassment.[7]

**6.** ***Failure to accommodate and engage in the interactive process***

Gardea contends the trial court erred in granting Defendants' motion with respect to her claim that Defendants failed to comply with their duty to make reasonable accommodations for her disability.[8] (Gov. Code, § 12940, subd. (m)(1).) According to Gardea, the evidence shows she suffered a wrist injury that caused her pain, numbness, and discomfort, to the point that she was unable to use her left hand. Gardea asserts the undisputed evidence shows Defendants did not provide her any accommodations for her disability, which is sufficient to survive summary judgment.

The FEHA requires an employer "to make reasonable accommodation for the known physical or mental disability of an . . . employee." (Gov. Code, § 12940, subd. (m)(1).) "To establish a failure to accommodate claim, [a plaintiff] must show (1) she has a disability covered by FEHA; (2) she can perform

---

[7] Gardea's complaint also alleged a harassment claim based on her disability. Gardea does not address that claim on appeal. Therefore, we do not consider it. (See *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 729 (*Arnold*) [declining to consider an issue the appellants did not brief on appeal].)

[8] Gardea did not address these claims in her opposition to Defendants' motion for summary judgment, which forfeits the issues on appeal. (See *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 (*DiCola*).) Nevertheless, we will consider the issues on the merits because they relate to Gardea's discrimination claims.

the essential functions of the position; and (3) [her employer] failed reasonably to accommodate her disability." (*Brown v. Los Angeles Unified School District* (2021) 60 Cal.App.5th 1092, 1107.)

Here, even assuming Gardea's wrist injury constituted a disability, she presented insufficient evidence to show Defendants failed reasonably to accommodate it. Gardea concedes that she never requested an accommodation. Nor has she ever identified the reasonable accommodations that Defendants were required to make. In passing, Gardea suggests she required an accommodation because her disability limited her ability to use a computer. However, she cites no evidence in support of that assertion. On this record, no reasonable trier of fact could find in Gardea's favor on her claim for failure to accommodate.

Nor did Gardea submit sufficient evidence to support her claim for failure to engage in the interactive process. An employer is required to engage in the interactive process with an employee "in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (Gov. Code, § 12940, subd. (n).) "The purpose of the interactive process is to determine what accommodation is required." (*A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 464.)

"Typically, an applicant or employee triggers the employer's obligation to participate in the interactive process by requesting an accommodation. (§ 12940, subd. (n).) Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation." (*Gelfo v.*

*Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 62, fn. 22.) In other words, the "employee must initiate the process unless the disability and resulting limitations are obvious." (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013.)

Although Gardea concedes she never requested an accommodation, she contends a reasonable trier of fact could conclude Defendants' duty to engage in the interactive process arose when they became aware she was experiencing severe pain in her wrist. According to Gardea, her need for an accommodation should have been obvious to Defendants at that point. We disagree.

It is undisputed that, the same day Gardea disclosed her wrist injury to Defendants, a Lakeshore employee transported her to a medical clinic where she received treatment. Upon returning from the clinic, Kissinger offered to allow Gardea to go home and rest. According to Kissinger, Gardea refused the offer and said she "could return to full work." Gardea presented no evidence to the contrary. Nor does she point to evidence that, after receiving treatment for the wrist injury, her ability to work was limited in any way, let alone a way that should have been obvious to Defendants. On this record, no reasonable trier of fact could conclude Defendants had a duty to initiate the interactive process. Accordingly, the court properly granted Defendants' motion as to Gardea's claim for failure to engage in the interactive process.

## 7. *Intentional infliction of emotional distress*

Gardea contends the trial court erred in granting summary judgment with respect to her claim for IIED. However, she concedes that she did not address that claim in her opposition to Defendants' motion for summary judgment in the trial court.

35

Her failure to do so forfeits the issue on appeal. (See *DiCola, supra*, 158 Cal.App.4th at p. 676 [an argument or theory in opposition to a motion for summary judgment will not be considered if it is raised for the first time on appeal].)

We are not persuaded by Gardea's contention that she "ran out of room" to address the issue in her opposition brief, or that the California Rules of Court do "not provide plaintiffs with the ability to address and defend *all* of their claims on summary judgment." For future reference, we direct counsel to rule 3.1113(e) of the California Rules of Court, which states a "party may apply to the court ex parte but with written notice of the application to the other parties, at least 24 hours before the memorandum is due, for permission to file a longer memorandum. The application must state reasons why the argument cannot be made within the stated limit."

## 8.    *Other claims*

Gardea seems to concede that most of her remaining claims[9] arise out of her FEHA claims for discrimination, harassment, and retaliation. Because the court properly granted Defendants' motion as to the FEHA claims, it also properly granted the motion as to the dependent claims.[10]

---

[9]    Those claims are for failure to prevent harassment, discrimination, and retaliation, wrongful termination in violation of public policy, and negligent hiring, supervision, and retention.

[10]    Gardea's complaint also asserted a claim for a violation of Labor Code section 1102.5. Gardea does not address that claim on appeal, which forfeits the issue. (See *Arnold, supra,* 91 Cal.App.4th at p. 729.)

## DISPOSITION

We affirm the judgment.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, Acting P. J.

We concur:


ADAMS, J.


HANASONO, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.